COMMONWEALTH vs. LEWIS ANDERSON.

Norfolk. September 10, 1991. - November 26, 1991.

Present: LIACOS. C.J., NOLAN. LYNCH. O'CONNOR, & GREANEY, JJ.

*Evidence*, Failure to produce witness. *Practice, Criminal*, Instructions to jury, Argument by prosecutor.

At the trial of a prison inmate charged with assault and battery by means of a dangerous weapon upon another inmate during an incident in the prison's dining hall, the defendant was not entitled, in the circumstances, to have the jury instructed that they could infer that, had the prosecutor called the victim as a witness, his testimony would have been unfavorable to the Commonwealth. [282-285]

At a criminal trial, the prosecutor's closing argument was not improper. [285-287]

INDICTMENT found and returned in the Superior Court Department on January 24, 1990.

The case was tried before *Roger J. Donahue*, J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Nona E. Walker*, Committee for Public Counsel Services, for the defendant.

*James F. Lang*, Assistant District Attorney, for the Commonwealth.

GREANEY, J. A jury in the Superior Court found the defendant, Lewis Anderson, an inmate at the Massachusetts Correctional Institution at Cedar Junction (M.C.I. Cedar Junction), guilty of assault and battery by means of a dangerous weapon, a "razor shank," on another inmate, Charles Jenkins. Jenkins was not called as a witness for the prosecution at trial. The Appeals Court reversed the defendant's conviction and ordered a new trial because the judge refused to give a "missing witness" instruction with respect to the

Commonwealth's failure to call Jenkins to testify.[1] *Commonwealth* v. *Anderson*, 30 Mass. App. Ct. 474 (1991). We granted the Commonwealth's application for further appellate review. We conclude that the defendant was not entitled to the "missing witness" instruction. We also conclude that portions of the prosecutor's summation, which the defendant's appellate counsel now claims were unfair and prejudicial, were in fact proper. Consequently, we affirm the judgment of conviction.

The Commonwealth presented evidence that on December 2, 1989, about 7:45 A.M., a fight broke out in the dining hall of M.C.I. Cedar Junction between the defendant and Jenkins. Correction Officer Michael Tate testified that at the time of the fight he was assigned to the dining hall gas tower[2] located about fifteen feet above the dining hall and about twenty-five to thirty feet from where the incident took place. From the tower, Tate could observe the whole dining hall. There were about 225 inmates and five staff people in the dining hall at the time. Tate saw "a verbal argument" between the defendant and Jenkins, but could not hear what was said. Tate saw the defendant gesturing, pointing, and flailing his arms while Jenkins stood with his hands at his side "more or less in a defensive posture." Tate then saw the defendant lunge at Jenkins and saw the defendant "swinging his hands in a sweeping-like motion." Jenkins overpowered the defendant and was on top of the defendant, punching him, when guards arrived and handcuffed both men.

---

[1] "Where a party has knowledge of a person who can be located and brought forward, who is friendly to, or ·at least not hostilely disposed toward, the party, and who can be expected to give testimony of distinct importance to the case, the party would naturally offer that person as a witness. If, then, without explanation, he does not do so, the jury may, if they think reasonable in the circumstances, infer that that person, had he been called, would have given testimony unfavorable to the party." *Commonwealth* v. *Schatvet*, 23 Mass. App. Ct. 130, 134 (1986).

[2] The gas tower receives its name from the fact that the officer staffing it has control of several canisters of gas located throughout the dining hall which he can activate in the event of a disturbance.

Correction Officer Luiz Cabral testified that he observed the incident involving the defendant and Jenkins from his station at the entrance to the dining hall. Cabral noticed Jenkins sitting down and saw the defendant approach Jenkins and point at him. According to Cabral, "Jenkins then stood up and covered himself. Then . . . Jenkins started chasing [the defendant], going from one table to another table, and they ended up fighting on the floor."

Correction Officer Russell Hallett testified that he was called to the dining hall from the east-wing corridor to help deal with the incident. When Hallett arrived he observed that the defendant had a weapon in his hand, and was "moving his hands . . . in a slashing way towards [Jenkins]." The defendant dropped the razor shank after the two men were separated.

The Commonwealth also presented evidence that the only visible wounds on the defendant following his altercation with Jenkins were small cuts or abrasions on two of his knuckles. Jenkins had lacerations on both of his elbows, the right and left sides of his lower back, the left side of his chest, and the right side of his neck. Two of the lacerations required suturing.

A former inmate at M.C.I. Cedar Junction testified for the defendant. This inmate indicated that he used to sit at the same table as the defendant every day for meals, while Jenkins would sit at a table beside them. He described Jenkins as about "five eight, five nine" and husky, and the defendant as having a build which was "nothing" compared to Jenkins's. On December 1, 1989, Jenkins and his friends tried to sit at the defendant's table. Jenkins told the defendant that if he did not leave the table he would get hurt. Later that evening, the inmate told the defendant that he had seen Jenkins in the prison with a weapon, that Jenkins and his friends had previously assaulted other inmates, and that, if Jenkins was planning to "make a move" on the defendant, he would not do it alone.

The inmate also testified that, on December 2, Jenkins sat down at the defendant's table in front of the defendant's tray

and moved the tray. The defendant and Jenkins exchanged words. Jenkins stood up and had his hands in his pockets. According to the inmate, "Jenkins came up with his hands," and the two men started "tussling." The guards arrived shortly thereafter. The inmate had not seen who struck the first blow. The defendant did not testify.

At the conclusion of the evidence, the defendant's trial counsel submitted written requests for instructions. These included requests for instructions on self-defense and an instruction to the effect that the jury could infer that, if Jenkins had been called, his testimony would be unfavorable to the Commonwealth. The judge indicated that he was going "to cover [the defendant's] requests." Both the prosecutor and the trial counsel made no reference in their closing arguments to the absence of Jenkins as a witness. The judge's charge included a full explanation of self-defense but did not include a "missing witness" instruction. After the charge, the defendant's trial counsel called the judge's attention to the omission. The judge refused to give the requested instruction because trial counsel had not referred to Jenkins's absence in her closing argument.

1. We have said that "[w]hether an inference can be drawn from the failure to call witnesses necessarily depends . . . upon the posture of the particular case and the state of the evidence." *Commonwealth* v. *O'Rourke*, 311 Mass. 213, 222 (1942). See generally P.J. Liacos, Massachusetts Evidence 283-284 (5th ed. 1981). Because the inference permitted to be drawn with respect to a missing witness "can have a seriously adverse effect on the noncalling party — suggesting, as it does, that the party has wilfully attempted to withhold or conceal significant evidence — it should be invited only in clear cases, and with caution." *Commonwealth* v. *Schatvet*, *supra* at 134. See *Commonwealth* v. *Zagranski*, 408 Mass. 278, 287 (1990)("This is a delicate area, requiring caution"). When it appears that the witness may be as favorable to one party as the other, no inference is warranted. *Commonwealth* v. *Schatvet*, *supra* at 134 n.8. Further, if the circumstances, considered by ordinary logic and

experience, suggest a plausible reason for nonproduction of the witness, the jury should not be advised of the inference. *Id.* at 135 n.11. In the last analysis, the trial judge has discretion to refuse to give the instruction, see *Commonwealth v. Franklin*, 366 Mass. 284, 294 (1974); *United States v. Cotter*, 60 F.2d 689, 692 (2d Cir.), cert. denied, 287 U.S. 666 (1932), and, conversely, a party who wishes the instruction cannot require it of right. See 2 C.A. Wright, Federal Practice and Procedure § 489 (2d ed. 1982).

It is by no means apparent that Jenkins should be considered a witness who would be friendly to the Commonwealth. After prosecution by the Commonwealth, he had been convicted of a crime or crimes which had resulted in his incarceration in a maximum security State prison. Logic would dictate that, because of his status, and the Commonwealth's role in prosecuting him, Jenkins would be naturally antagonistic toward the Commonwealth's interests. Further, testimony by Jenkins for the prosecution could expose him to danger by reason of the informal prison code that condemns prisoners who cooperate with the authorities against other prisoners.[3] These considerations cut against characterizing the case for permitting the inference as "clear," and indicate that Jenkins would likely be hostile to both sides of the case (or at least not entirely favorably disposed to assist the prosecution).

There are other pertinent considerations. The Commonwealth could make out its case by the testimony of the correction officers which has been summarized above. Putting Jenkins on the witness stand posed the risk that the jury might have learned that Jenkins was serving a sentence at

---

[3] On this point, it is worth noting that the defendant's appellate counsel has filed a motion in connection with this appeal that the true name of the inmate who testified at trial for the defense not appear in the opinion deciding the case. The affidavit supporting this motion states that the fact of the inmate's testimony "may put him at risk in any institution where he may be incarcerated presently or in the future."

M.C.I. Cedar Junction for murder.[4] Bringing that fact to light might have weakened the Commonwealth's case, in spite of whatever testimony on the assault that Jenkins might have provided, and increased the chance that the jury might have been diverted from an objective analysis of the issues by consideration of Jenkins's criminal record and background. The prosecution obviously sought to place before the jury its strongest case, as free as possible from the consideration of collateral issues, because a conviction would help deter unnecessary violence by inmates in State penal institutions against each other. In deciding not to use Jenkins as a witness, the prosecutor may have felt that the defendant's claim of self-defense lacked substance and, consequently, chose not to risk assisting that claim by unnecessary testimony.[5] We have said, when urging caution in the area of giving a "missing witness" instruction, that "[a] witness may be withheld because of his prior criminal record, or because he is susceptible to cross-examination on collateral issues, or for other tactical reasons." *Commonwealth* v. *Franklin, supra.* These observations have application here and afford additional rea-

---

[4]The defendant's trial counsel tried nonetheless to get this information before the jury. She asked Officer Tate, during cross-examination: "And you are aware of the fact that Charles Jenkins is serving a sentence for murder, isn't that true?" The judge sustained an objection by the prosecutor to the question. The inquiry points up some of the difficulty the Commonwealth would have in offering Jenkins.

[5]The testimony of the Commonwealth's witnesses warranted finding that the defendant had initiated an attack with a deadly weapon on Jenkins, who was unarmed. The testimony of the inmate called by the defendant did not materially contradict the testimony of the prosecution's witnesses. There was virtually no evidence to show that the defendant had a reasonable basis to believe that he was in *imminent* danger of death or serious bodily harm from which he could save himself *only* by using deadly force, see *Commonwealth* v. *Blake,* 409 Mass. 146, 158 (1991); and no indication that the defendant had availed himself of all reasonable means to avoid physical combat before resorting to the use of deadly force, see *Commonwealth* v. *McGuirk,* 376 Mass. 338, 345 (1978); *Commonwealth* v. *Kendrick,* 351 Mass. 203, 212 (1966). Rather, the evidence indicated that the defendant responded with deadly force to a prior threat, a generalized fear based on information that Jenkins had been armed in the past, and a verbal disagreement.

sons why, on this record, the nonproduction of Jenkins does not persuasively justify resort to the "missing witness" principle.[6] As was stated in *Commonwealth* v. *Schatvet, supra* at 136: "A party need not call everyone who might have information on a given subject, on pain, if he omits any, of suffering a jury inference that he is wrongly withholding damaging evidence."

The judge refused the instruction because the defendant's trial counsel had not commented on Jenkins's absence in her summation. (Based on the lack of comment in the closing argument of trial counsel, the prosecutor also refrained from any comment on the issue.) The reason given by the judge for refusing the instruction was not entirely correct, because the issue of a missing witness can be covered by comment of counsel in final argument, by instruction alone, or by both methods. See *Commonwealth* v. *Vasquez*, 27 Mass. App. Ct. 655, 658 (1989). In any event, the judge's underlying ruling was right. Based on the considerations discussed above, the defendant was not entitled to a missing witness instruction. On this issue, therefore, the defendant has not shown a basis for our ordering a new trial.

2. The defendant's appellate counsel argues that the prosecutor overstepped the bounds of proper argument. Four specific passages in the prosecutor's summation are singled out for criticism as follows:

(a) "This prison in the chow hall needs a gas tower for the type of people you are dealing with. Five guards. Two hundred fifty inmates. You need a gas tower in case something happens. But that is the kind of people you are dealing with. You are not talking about the corner of Boylston and Tremont Streets in Downtown Boston. You are taking about MCI Cedar Junction."

---

[6]Further, if equal availability is considered, the defendant appears to have had equal access to Jenkins. The defendant could have produced him as a witness in his case and examined Jenkins as a hostile witness through cross-examination.

(b) "Charles Jenkins was sentenced by a court to a sentence at MCI Cedar Junction just like Lewis Anderson. He was not sentenced to be cut to pieces by Lewis Anderson and his shank."

(c) "Lewis Anderson could not get along in society and he was sent to [Cedar Junction]. He could not get along in [Cedar Junction] so he is sent here."

(d) "Ladies and gentlemen, you don't find swans in a sewer and I submit to you that MCI Cedar Junction is a sewer. And what helps make MCI Cedar Junction a sewer are inmates walking around with razor shanks such as Lewis Anderson had and attacking other inmates such as Charles Jenkins."

The defendant's trial counsel neither objected to the remarks, nor requested a curative instruction. We inquire whether anything in the remarks created a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Fitzgerald*, 376 Mass. 402, 416 (1978).

The remarks in (a) were proper. The evidence in the case indicated that M.C.I. Cedar Junction housed difficult and dangerous criminals, and the defendant's trial counsel made the same point in her summation. The argument simply elaborated on the setting in which the incident occurred.

The remarks in (b) were a permissible reminder to the jury that, even though Jenkins had been sentenced to the State prison as a consequence of some wrongdoing, his right to be free from an attack by another inmate had not thereby been forfeited. Further, the remarks were in essence the reverse side of an argument by the defendant's trial counsel that even in M.C.I. Cedar Junction the defendant did not "give up the right to defend himself in the face of a threat" by Jenkins. The prosecutor was entitled to cast the evidence in terms favorable to the Commonwealth and to respond as he did to argument made by the defendant's trial counsel.

The remarks in (c) told the jury nothing they did not already know from the fact that the defendant was incarcer-

ated at the State's maximum security prison. The remarks made no unfair comment on the defendant's status.

The remarks in (d) represented a dramatic flourish that was probably not meant to be taken literally. The jury undoubtedly were aware that the prosecutor was arguing his view, and they had the capacity to discount hyperbole. *Commonwealth* v. *Glass*, 401 Mass. 799, 806 (1988). The statement came against a background that the defendant had used a razor shank to wound Jenkins and that M.C.I. Cedar Junction was a dangerous environment prone to assaultive conduct and the presence of illegal weapons. The last facts were vigorously pushed by the defendant's trial counsel in her summation. The prosecutor's remarks may have been strong but they were not over the line marking impermissibility.

We conclude, therefore, that the prosecutor's final argument, considered as a whole and in light of the evidence and the contentions at trial, was not improper.

*Judgment affirmed.*