COMMONWEALTH *vs.* ANTONIO MERCARDO GARCIA.[1]

Middlesex. December 6, 1995. - January 12, 1996.

Present: LIACOS, C.J., WILKINS, O'CONNOR, GREANEY, & FRIED, JJ.

*Controlled Substances. Practice, Criminal,* Instructions to jury, Sentence. *Entrapment.*

At the trial of indictments for trafficking in cocaine, the judge correctly and thoroughly instructed the jury on the issue of entrapment and properly denied the defendant's request for an instruction, based on a theory of "sentencing entrapment," to the effect that, although the defendant may have been predisposed to commit a lesser offense (possession or sale of small quantities of cocaine) the jury could find that the defendant was entrapped into committing the greater offenses (trafficking) which are subject to greater penalties. [690-693]

INDICTMENTS found and returned in the Superior Court Department on February 11, 1992.

The cases were tried before *Wendie I. Gershengorn*, J.

The Supreme Judicial Court granted an application for direct appellate review.

*Regina Zupan*, Committee for Public Counsel Services, for the defendant.

*Barbara F. Berenson*, Assistant District Attorney (*William F. Bloomer*, Assistant District Attorney, with her) for the Commonwealth.

GREANEY, J. A jury in the Superior Court convicted the defendant of trafficking in more than one hundred (but less than 200) grams of cocaine, G. L. c. 94C, § 32E (*b*) (3) (1994 ed.); trafficking in more than fourteen (but less than twenty-eight) grams of cocaine, G. L. c. 94C, § 32E (*b*) (1);

---

[1]As is our custom, we spell the defendant's name as it appears on the indictments. See *Commonwealth* v. *Rodriquez*, 418 Mass. 1 (1994).

and possession of cocaine with intent to distribute, G. L. c. 94C, § 32A (1994 ed.). The defendant appealed and we granted his application for direct appellate review. On appeal, the defendant argues error in the judge's refusal to give a so-called "sentencing entrapment" instruction which was requested by his trial counsel. The instruction was intended to support the defendant's contention that, while he had not been improperly induced by an undercover police officer to sell small quantities of cocaine, he had been entrapped to sell larger amounts, which the undercover officer had calculatedly demanded in order to obtain convictions of more serious trafficking charges and the imposition of higher mandatory minimum sentences. We conclude that the instruction requested by the defendant was properly denied by the trial judge, and that she correctly instructed the jury on the issue of entrapment. Accordingly, we affirm the defendant's convictions.

The relevant background may be summarized as follows. In October, 1991, a new Marlborough police officer was assigned to conduct an undercover operation at a local lounge. The undercover officer's supervisor indicated that the object of the operation was to buy the largest amount of cocaine possible. When the supervisor instructed the undercover officer as to the amounts to purchase, he had in mind that a minimum of fourteen grams was needed to support a trafficking charge, and that the purchase of one hundred grams would result in a more serious trafficking charge and in a specific enhanced penalty.

The undercover officer first purchased cocaine from the defendant on October 24, 1991. She approached him and asked if he had anything she could buy. In response to her request for "a half" (namely, one-half gram), the defendant stated a price of $50. In exchange for this sum, the defendant approached another man in the lounge and subsequently gave the undercover officer a small bag of white powder. Another purchase of "a half," by the undercover officer from the defendant, which progressed along the lines of the earlier purchase, occurred on November 15, 1991.

On November 15, 1991, the undercover officer indicated to the defendant that she had some friends who wanted to buy one-half ounce of cocaine. The defendant did not know the price for that quantity but promised to find out, and two days later informed the undercover officer that the price would be $525. The undercover officer advised the defendant that she would tell her friends.

On November 19, the defendant became upset after learning that the undercover officer had just purchased some cocaine from someone else because the price was lower. She asked if he could obtain his cocaine at a cheaper price, and he said he would have to find out.

On November 22, the defendant told the undercover officer that he had something for her for $35. She said she did not want anything at that time, but that she was still gathering money from her friends to complete the one-half ounce purchase.

On November 25, the undercover officer bought "a half" from the defendant for $35, and inquired about the one-half ounce purchase. The defendant said, "You wanted [seven] or [eight] grams, right?" The undercover officer replied that she wanted one-half ounce. He asked her the weight of that quantity, saying he was not "up on the weights, he wasn't [too] familiarized with them." The defendant also asked what he had quoted her for a price, and she said $525. They arranged to make the sale the following Tuesday.

On Tuesday, November 26, the undercover officer joined the defendant in the lounge and told him she was "all set," but that, in addition to the one-half ounce, she also wanted to purchase three one-half gram packets. (The undercover officer's supervisor had told her to make this request to ensure that the amount of cocaine purchased would exceed fourteen grams.) A price of $620 was agreed on. The defendant obtained and delivered to the undercover officer a packet of cocaine that weighed between sixteen and eighteen grams. He also gave her three additional one-half gram packets.

On November 27, the defendant told the undercover officer that he had learned an ounce of cocaine would cost

$1,100, and that she should let him know when she needed it and he would be able to obtain it. He also asked the undercover officer whether she had obtained anything for her one-half ounce. The undercover officer indicated that she had received some cocaine, and the defendant replied, "See how everything works out? You got your stuff and I get something."

On December 3, the defendant asked the undercover officer if she still wanted to purchase two ounces of cocaine. She said she did, and the defendant said the cost would be $2,100. The next day the defendant told the undercover officer that he had heard she was a "snitch" working for the police, and that in his country, snitches were killed. The defendant also told her that he liked her, and that, even if she sent him to jail, he would not hate her. He said he was selling drugs to support his children.

On December 13, the defendant asked the undercover officer if she still wanted two ounces of cocaine. She said (as she had been instructed to by her supervisor) that she now wanted four ounces. The defendant appeared upset, saying, "[You are] confusing [me], at first [you] wanted one ounce and now [you] wanted four." The undercover officer replied, "[L]ook, you told me you can get it, right?"

On December 16, the undercover officer spoke to the defendant again. He said he would have to see whether he could obtain four ounces of cocaine. She purchased another one-half gram. With her permission, the defendant ingested part of the cocaine, kept part of it, and gave the rest to her.

On December 19, the undercover officer again told the defendant that she wanted to purchase four ounces of cocaine. He replied, "[F]our ounces, I don't know." That evening the defendant sold her another small bag of white substance, and indicated that the price for four ounces would be $1,100 per ounce. They agreed to consummate the sale.

The following evening, the defendant met the undercover officer. They drove to a location where the defendant met and left with another man. Five minutes later, the defendant returned and said to the undercover officer, "Okay, let's go."

They drove to a parking lot, where police subsequently arrested the defendant with four bags of cocaine in his hand. The four bags contained a total of 112.14 grams of cocaine.

Based on the evidence in the case, the defendant's trial counsel requested the jury instruction set forth in the margin.[2] The judge declined to give the instruction, and the defendant's trial counsel preserved a proper objection. The judge instructed the jury at length on the issue of entrapment, as it pertained to all the charges. The instruction given by the judge clearly and comprehensively dealt with all the elements of entrapment, including the role of undercover police work, government inducement, predisposition by a defendant to commit a crime, factors to consider in deciding whether the defendant was willing to commit the crimes, the need to acquit a defendant who had been entrapped in order to promote public policy, and the burden of the Commonwealth to satisfy the jury beyond a reasonable doubt that the defendant had not been enticed or ensnared by the police

[2]"Even if you find beyond a reasonable doubt that the defendant possessed with intent to distribute or did distribute quantities of cocaine in excess of [one hundred] grams or [fourteen] grams, you may consider whether or not the defendant was entrapped into possessing or distributing those quantities. You must be convinced beyond a reasonable doubt that he was not entrapped before you would be warranted in convicting him of trafficking.

"If the defendant's possession or distribution of the proscribed quantities of cocaine was solely because of the inducement of the police, you could find him guilty of the lesser included offense of possession with intent to distribute or distribution, rather than trafficking. In other words, if the amount of cocaine which the defendant had was solely the product of police entrapment, he cannot be found guilty of a greater offense because of that amount.

"In considering whether you are convinced beyond a reasonable doubt that the defendant was not entrapped you may consider the extent to which he was induced, persuaded, cajoled or convinced by police statements or conduct to obtain the amount of cocaine in question. You may consider the frequency and tone of the officer's requests or solicitation for obtaining the amounts in question. You may consider whether there is any evidence that he had previously possessed or distributed like amounts. You may consider whether there is evidence of the defendant's familiarity with weights, packaging, pricing or distribution of like amounts of cocaine."

into committing crimes that he had not intended to commit.[3] Under the judge's instruction, the jury could not have found that the officer's mere request for greater amounts of cocaine constituted entrapment.

We proceed to the merits of the appeal. The defendant concedes in his brief that the several sales of one-half grams of cocaine made to the undercover officer were not the product of entrapment "because the officer merely asked to buy the half-grams and the defendant did not balk." The defendant maintains, however, that, with respect to the sales over fourteen grams and over one hundred grams, there was a basis for the jury to find that the defendant had been entrapped solely as to the trafficking charges. The defendant further argues that the instruction, which was requested and denied, states the theory of "sentencing entrapment" which is "a legitimate theory of defense even where the defendant was not entrapped to sell smaller amounts." He concludes that we should adopt the theory, and require jury instruction on it, when a defendant (in the position he claims to have been in) is predisposed to commit a lesser offense but is entrapped into committing greater offenses which are subject to enhanced punishment.

Our law of entrapment focuses on the defendant's predisposition to commit the crime with which he is charged. Once a defendant properly raises an issue as to entrapment by pointing to some evidence of inducement or solicitation on the part of government agents, the Commonwealth must establish, beyond a reasonable doubt, that the defendant was predisposed to commit the crime with which he is charged. *Commonwealth* v. *Shuman*, 391 Mass. 345, 350-351 (1984).[4] This focus on the defendant's predisposition to com-

---

[3]The Commonwealth requested Sample A of the instructions on entrapment from the Superior Court Model Jury Instructions (1990), on the issue. The instruction given by the judge covered all the factors in the sample instruction and went beyond the sample to discuss entrapment in greater detail.

[4]The defendant did not request, and, on the evidence was not entitled to, a separate instruction based on *Commonwealth* v. *Shuman*, 391 Mass.

mit a crime, and the requirement that the government prove that disposition, ensures that "unwary innocents" are protected against conviction of crimes they would not have committed in the absence of governmental overreaching.

Our law also recognizes that undercover police work is a legitimate investigative technique. In order to pursue such work, an undercover officer must often develop a relationship of trust with a drug dealer by purchasing small quantities of narcotics over a long period of time. "[A]n established drug dealer will not readily sell large quantities of drugs to a new customer and . . . repeated buys are necessary to gain the dealer's confidence." *United States* v. *Barth*, 990 F.2d 422, 425 (8th Cir. 1993). Some reluctance, hesitation, or wariness on the part of a drug dealer is to be expected. "By their nature, sting operations are designed to tempt the criminally inclined, and a well-constructed sting is often sculpted to test the limits of the target's criminal inclinations." *United States* v. *Connell*, 960 F.2d 191, 196 (1st Cir. 1992). Further, by cultivating a drug dealer's trust, and slowly building up the quantity of sales, an undercover agent may be able to ascertain, and bring to justice, the dealer's source of supply.

We reject the defendant's arguments that we should adopt the notion of "sentencing entrapment" as an issue to be considered by a factfinder in deciding whether the government has proved beyond a reasonable doubt that entrapment is not present. The defendant has not offered a citation to any State appellate court decision approving the concept as an issue to be dealt with at trial. The issue appears to be a recent theory advanced principally by some defense counsel in the Federal courts. "The assertion here is that the 'government ratchets up a defendant's drug sales or other conduct merely to increase his sentence.' The argument, thus, is not that the defendant should be acquitted of the underlying offense because of the government's inducement, but rather that the sentence should not be enhanced based upon such govern-

345, 353-355 (1984), concerning egregious misconduct by government officials.

mental activity. Few courts have directly recognized this form of entrapment defense." (Footnotes omitted.) P. Marcus, The Entrapment Defense § 8.05a, at 81-82 (Supp. 1995). One United States Circuit Court of Appeal has recognized, in theory, that a downward departure under the Federal sentencing guidelines might be warranted where a government agent has made a series of undercover buys for the sole purpose of enhancing a penalty. See *United States* v. *Barth*, 990 F.2d 422, 424-425 (8th Cir. 1993). In only one case, decided by the United States Court of Appeals for the Ninth Circuit, has resentencing been ordered on this basis. See *United States* v. *Staufer*, 38 F.3d 1103, 1106-1108 (9th Cir. 1994). These decisions are driven by judicial concern, in certain limited circumstances, about the results of sentencing under the Federal sentencing guidelines. See *id.* at 1106. In other cases, the theory has been rejected outright, see *United States* v. *Williams*, 954 F.2d 668, 672-673 (11th Cir. 1993), or treated with skepticism. See *United States* v. *Washington*, 44 F.3d 1271, 1279-1280 (5th Cir.), cert. denied, 115 S. Ct. 2011 (1995). The Massachusetts Sentencing Commission which has been established pursuant to St. 1993, c. 432, § 1, and which, among other subjects, is considering the efficacy and role of mandatory minimum sentences, may wish to consider whether a judge should be able to reduce a mandatory sentence in circumstances of governmental overreaching. See generally *Commonwealth* v. *Russo, ante* 317, 320-322 (1995). We are not inclined to adopt the theory advanced by the defendant. We conclude that the instruction given by the judge, which more than adequately covered the subject of entrapment, was sufficient.

*Judgments affirmed.*