COMMONWEALTH *vs.* PEDRO SALETINO.

Essex. April 2, 2007. - August 10, 2007.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, & CORDY, JJ.

*Controlled Substances. Entrapment. Practice, Criminal,* Sentence, Instructions to jury, Witness, Attendance of witnesses. *Joint Enterprise.*

At the trial of indictments charging the defendant with, inter alia, trafficking in 200 grams or more of cocaine, the judge did not err in denying the defendant's motion to pursue a sentencing entrapment defense and in refusing to instruct the jury on sentencing entrapment, where even if the defense were recognized, it would not be warranted here, in that none of the evidence presented at trial demonstrated government inducement to commit an offense greater than the defendant was predisposed to commit. [663-667]

The judge at a criminal trial did not abuse his discretion in denying the defendant's request for a "missing witness" instruction relating to the Commonwealth's failure to call a confidential informant as a witness, where the Commonwealth had logical tactical reasons for deciding not to call the informant as a witness [667-669]; further, the judge did not implicitly find that the foundational requisites for such an instruction had been met, and although the judge erred in permitting the defendant to make a missing witness argument in closing after the judge had declined to give a missing witness instruction, the error was not prejudicial, as the defendant received more than that to which he was entitled [669-673].

At the trial of indictments charging the defendant with, inter alia, trafficking in twenty-eight grams or more of cocaine, the judge did not err in instructing the jury on joint venture, where the evidence permitted a reasonable inference that there was at least one person other than the defendant present at a certain address who was involved in the drug transaction in question. [673-674]

INDICTMENTS found and returned in the Superior Court Department on December 15, 1993.

The cases were tried before *David A. Lowy,* J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Paul R. Rudof,* Committee for Public Counsel Services (*Nona E. Walker,* Committee for Public Counsel Services, with him) for the defendant.

*Jonathan M. Ofilos,* Assistant Attorney General, for the Commonwealth.

*Matthew A Kamholtz,* for National Association of Criminal Defense Lawyers, amicus curiae, submitted a brief.

IRELAND, J. The defendant was convicted after a jury trial of trafficking in 200 grams or more of cocaine, G. L. c. 94C, § 32E (*b*) (4); trafficking in twenty-eight grams or more of cocaine, G. L. c. 94C, § 32E (*b*) (2); and conspiracy to violate the Controlled Substances Act, G. L. c. 94C, § 40. The defendant appealed, and we transferred this case from the Appeals Court on our own motion. The defendant now argues that the trial judge erred in denying his motion to present a defense of sentencing entrapment,[1] in refusing his requests for jury instructions on sentencing entrapment and a missing witness, and in giving a joint venture instruction. Because we conclude that none of these rulings was erroneous, we affirm the defendant's convictions.[2]

*Background.* We summarize the essential facts, which are not contested, reserving certain details for our discussion of the issues raised.

During the summer of 1993, the defendant was the target of an undercover narcotics operation. A State police trooper posed

---

[1] Whereas under principles of traditional entrapment, a defendant argues that the government has "instigate[d] crime by implanting criminal ideas in innocent minds and thereby bringing about offenses that otherwise would never have been perpetrated," *Commonwealth* v. *Shuman,* 391 Mass. 345, 351 (1984), quoting R. Perkins, Criminal Law 1031 (2d ed. 1969), a defendant alleges sentencing entrapment when he argues that the government induced him to commit a greater offense than he was predisposed to commit. See *Commonwealth* v. *Garcia,* 421 Mass. 686, 687 (1996).

Sentencing entrapment is often raised during the sentencing phase of proceedings in Federal court because of the variation in sentence based on factors such as the amount of drugs involved under the Federal sentencing guidelines, which provided the original justification for the defense of sentencing entrapment, see *id.* at 693. See, e.g., *United States* v. *Gutierrez-Herrera,* 293 F.3d 373, 375, 377 (7th Cir. 2002); *United States* v. *Ogbonna,* 184 F.3d 447, 451 (5th Cir.), cert. denied, 528 U.S. 1055 (1999). However, defendants also argue sentencing entrapment in Federal court where, as here, the amount and type of drugs triggers a statutory mandatory minimum sentence. See, e.g., *United States* v. *Rogers,* 982 F.2d 1241, 1245 (8th Cir.), cert. denied sub nom. *Philip* v. *United States,* 509 U.S. 912 (1993).

[2] We acknowledge the amicus brief of the National Association of Criminal Defense Lawyers.

as a narcotics trafficker from Cape Cod who was looking for a new source of supply of cocaine. A confidential informant[3] had a relationship with the defendant, and the plan was for the informant to provide a cover story for the undercover trooper.

At approximately 5 P.M. on August 3, the informant introduced the undercover trooper to the defendant at a meeting at 269 Meridian Street in the East Boston section of Boston. The undercover trooper and the defendant discussed the quality of the cocaine that the trooper wanted to purchase. The three men then got into the trooper's vehicle and drove to Lynn. During the drive, the trooper and the defendant continued to discuss the quality of the cocaine that the trooper wanted to purchase, and the defendant provided assurances as to its quality. The trooper stated that if the quality of the cocaine was good, he could "probably do a whole package."[4] On their arrival at 48 Essex Street in Lynn, the defendant told the trooper that if he should be asked where he sells, he should not tell "them" because "the people will go down there and take over our business." The defendant asked the trooper to give the money for the cocaine to the informant and asked the informant to go into 48 Essex Street with him. The trooper asked the defendant to confirm the price of the cocaine, which the defendant did. The trooper gave the money to the informant, and the defendant and the informant walked to the rear of 48 Essex Street and entered through the porch area. A few minutes later, the informant returned to the trooper's vehicle and handed him a plastic bag containing a "rock and white powder substance."[5]

On August 4, the undercover trooper spoke with the defendant over the telephone three times. The trooper initiated each call, reaching the defendant at a "house" telephone number in East Boston. During the first conversation, the trooper told the defendant that he was content with what he had purchased and

---

[3]The confidential informant was paid approximately $1,000 at the end of the investigation.

[4]In conversation with the defendant, the undercover trooper used the term "animal," or "whole package," which he testified referred to a kilogram package of cocaine.

[5]A later analysis by the State police crime laboratory found that the substance was 59.4 grams of white rock powder and was seventy-one per cent cocaine.

he wanted to know if the defendant could get him a price on a kilogram of cocaine. The defendant told the trooper that he would have to check and get back to him. During the second call, the defendant stated that the owner of the cocaine had expressed concern about increasing the amount of cocaine from sixty-two grams to a kilogram. The trooper told the defendant that if he had known that there would be such concern, he would not have asked for such a large amount. The defendant said that he would talk to the owner of the cocaine and see what he could do and that he would get back to the trooper. During the third conversation, the defendant said that he had spoken with "his people" and that although they were concerned, they were willing to go forward with the transaction, but they wanted the defendant to check on the trooper's operation on Cape Cod and find out more about him. The defendant and the trooper arranged to meet the following day.

On August 5, the undercover trooper paged the informant, whom he knew was with the defendant. When the informant returned the call, the trooper spoke with the defendant. The defendant stated that he had an individual who was willing to sell a kilogram of cocaine for $24,000, but that they still needed to come down and see the trooper. The defendant and the trooper agreed to go together to Cape Cod. The trooper expressed concern to the defendant that the cocaine be of the same quality as the first purchase, and the defendant provided assurances that it would be. The defendant stated that the person who was providing the kilogram of cocaine, known as Chepe, was the person who had provided the earlier smaller amount, and that Chepe would procure the kilogram from one of his customers, Laurano Sanchez.

The undercover trooper waited in Bourne until he received a call from the informant. The trooper and another task force agent, who the trooper said was his partner in the Cape Cod area, went to the parking lot of a store and met the defendant and three other men, including the informant and a man who called himself "El Negreo." The trooper told the defendant that he wanted to take only the defendant and one other person to the house. The defendant, El Negreo, and the task force agent drove with the trooper in the trooper's vehicle to the prearranged location.

The undercover trooper and the task force agent gave the pair a tour, and the group discussed business on Cape Cod. During the conversation, the defendant asked the trooper for help setting up a point of distribution on Cape Cod. The defendant and the trooper engaged in further negotiations about the cocaine purchase. The trooper showed the defendant $25,000 in cash, which was $1,000 more than the negotiated price. The defendant again expressed his concerns about going from sixty-three[6] grams to a kilogram, saying that he and El Negreo needed to get to know the trooper better before they did such a deal. The trooper said that he worked with credit, that people would provide money up front because they trusted him, and that he would make the purchases and bring the cocaine back and distribute it. The trooper also told the defendant that his usual source of supply was in Rhode Island, and that he would normally take one kilogram and get a second on consignment.

The defendant said that his people could do what the trooper suggested, but that they had to start the way that they were starting. The defendant also indicated that Chepe would receive about ten kilograms at a time, and that they would be able to accommodate any requests the trooper might have. The trooper stated that he would be ready to conduct the transaction the next day. Later that afternoon, the trooper spoke with the defendant[7] and told him that he preferred to meet him the next day for the purchase of the kilogram because he wanted to bring his girl friend to make it look better.

On August 6, the defendant paged the undercover trooper. The trooper returned the call and stated that he was ready. At approximately 1:50 P.M., the trooper and the informant again went to 269 Meridian Street in East Boston and met the defendant and El Negreo. The defendant and El Negreo got into a small vehicle with Rhode Island registration plates and drove to 606 Summer Street in Lynn. The trooper followed them. The defendant, the trooper, the informant, and El Negreo went to the door, and the defendant knocked. The person who answered the

[6]This statement is in slight variance with the trooper's earlier testimony that the initial sale involved sixty-two grams of cocaine.

[7]The trooper testified that he was not sure whether he called the defendant's "house" number or whether the defendant paged him.

door, Senaldo Berroa, said that Sanchez was on his way. The trooper said he would come back, but the other men told him not to worry and that he should come inside. The men entered the living room and engaged in discussions about the quality of the cocaine that the trooper was purchasing and business on Cape Cod. The defendant again assured the trooper that the quality of the cocaine would be the same as what he had purchased before. In response to a statement that the defendant had made that he wanted to open up a distribution point on Cape Cod, the trooper informed the defendant that he knew of an apartment that the defendant could use for $700 per month.

After approximately ten minutes, Sanchez arrived. The trooper told Sanchez that he was ready, and Sanchez tossed a set of car keys to Diamedes Ramirez, who was present in the living room, and told him to go outside and get "the bag." Ramirez left and returned a few minutes later with a large trash bag. The trooper and Sanchez went into the bedroom while the defendant remained in the living room. The trooper took a package that Sanchez removed from the bag. The trooper gave the keys to his vehicle to the informant and told him to get the money. The informant's exit was a prearranged signal to the police surveillance team that the trooper had seen the drugs and needed assistance placing people under arrest. The trooper made a small incision in the package and observed that it contained white powder that appeared to be cocaine.[8] At this point, there was a knock on the door, and the trooper saw the informant at the threshold of the door. An officer from the police surveillance team was behind the informant. Berroa slammed the door, and El Negreo went to the door and tried to hold it closed. The defendant ultimately was arrested behind a coal bin in the basement of the house.[9]

*Discussion.* Because all of the defendant's claims on appeal were raised at trial, we review them for nonprejudicial error.

---

[8] A later analysis by the State police crime laboratory found that the substance was 987.61 grams of compressed white powder, which was fifty-four per cent pure cocaine.

[9] The defendant, who was released on bail, failed to appear for a court appearance after his arrest, and a default was entered. The default was removed on August 1, 2001, and the defendant was arraigned the following day.

See *Commonwealth* v. *Vinnie*, 428 Mass. 161, 163, cert. denied, 525 U.S. 1007 (1998).

1. *Sentencing entrapment.* Before trial, the judge denied the defendant's motion in limine for permission to present a defense of sentencing entrapment and granted the Commonwealth's motion in limine to prevent a sentencing entrapment defense, see note 1, *supra.* At trial, the defendant pursued a traditional entrapment defense.[10] The judge denied the defendant's request for a jury instruction on sentencing entrapment, but did provide an instruction on traditional entrapment[11] with respect to the charges of trafficking in 200 grams or more of cocaine and conspiracy. The defendant now argues that the trial judge erred in denying his motion to pursue a sentencing entrapment defense and in refusing to instruct the jury on sentencing entrapment. He contends that the United States Supreme Court's decision in *Apprendi* v. *New Jersey*, 530 U.S. 466 (2000), alters our holding in *Commonwealth* v. *Garcia*, 421 Mass. 686 (1996) (declining to recognize defense of sentencing entrapment). We need not address the question whether Massachusetts courts should recognize the defense of sentencing entrapment because we conclude that the defense of sentencing entrapment was not warranted on the evidence presented in this case.

At the outset, we note the distinction that is generally made between sentencing entrapment and sentencing factor manipulation: while the defense of sentencing entrapment focuses on the defendant's predisposition, see *United States* v. *Searcy*, 233 F.3d 1096, 1099 (8th Cir. 2000), a defense of sentencing factor manipulation is based on the behavior of the government and whether the evidence used to enhance the defendant's sentence was procured through outrageous conduct that was solely for the purpose of increasing the defendant's sentence, see *United*

---

[10]The defendant did not call any witnesses or present any evidence on his behalf at trial.

[11]At trial, the Commonwealth conceded that the defendant was entitled to a traditional entrapment instruction pertaining to the charge of trafficking in 200 or more grams of cocaine, and at oral argument the Commonwealth again conceded that there was sufficient evidence to warrant the traditional entrapment instruction.

*States* v. *Wagner,* 467 F.3d 1085, 1090 (7th Cir. 2006).[12] But see *United States* v. *Woods,* 210 F.3d 70, 75 (1st Cir. 2000) (conflating terms). Although in his brief the defendant cites cases that discuss both sentencing entrapment and sentencing factor manipulation, his argument focuses on sentencing entrapment only, and he raised only the issue of sentencing entrapment in his motion in limine and his requested jury instruction. Therefore, we limit our inquiry to whether the defendant was entitled to present a defense and receive a jury instruction on sentencing entrapment.[13]

This court has previously declined to recognize sentencing entrapment as a defense. *Commonwealth* v. *Garcia, supra* at 692. See *Commonwealth* v. *Cruz,* 430 Mass. 838, 846-847 (2000); *Commonwealth* v. *Ortiz,* 424 Mass. 853, 860-861 (1997).[14] Even were we inclined to do so now, viewing the evidence in the light most favorable to the defendant, see *Com-*

---

[12]The defenses cannot always be kept entirely separate. See *People* v. *Smith,* 31 Cal. 4th 1207, 1218 (2003) ("Sentencing manipulation, as we have said, focuses primarily on the objective conduct of the police. However, the conduct of the police does not occur in a vacuum, especially in a sting operation. The court's assessment of an officer's objective conduct will inevitably be colored by, for example, whether the defendant was from the start an enthusiastic proponent of the proposed crime or initially declined and was only gradually worn down").

[13]Even if the defendant argued that the judge should have instructed on sentencing factor manipulation, there was no evidence presented that would support such an instruction. See *United States* v. *Montoya,* 62 F.3d 1, 4 (1st Cir. 1995) (sentencing factor manipulation occurs when government engages in "extraordinary misconduct," and only in "extreme and unusual case").

[14]The Federal courts of appeal are split on whether to recognize the defense of sentencing entrapment. Compare *United States* v. *Searcy,* 233 F.3d 1096, 1099 (8th Cir. 2000) ("To ameliorate the danger of government abuse we have recognized sentencing entrapment as a viable theory for a downward departure under the Sentencing Guidelines"), with *United States* v. *Ramos,* 462 F.3d 329, 335 (4th Cir.), cert. denied, 127 S. Ct. 697 (2006) (declining to adopt sentencing entrapment rule), and *United States* v. *Tykarsky,* 446 F.3d 458, 476 n.13 (3d Cir. 2006) (noting that court had not yet recognized sentencing entrapment). See also *United States* v. *Scull,* 321 F.3d 1270, 1276 n.3 (10th Cir.), cert. denied sub nom. *Bono* v. *United States,* 540 U.S. 864 (2003) (analyzing sentencing entrapment claims under rubric of outrageous government conduct); *United States* v. *Montoya, supra* (recognizing sentencing factor manipulation defense where there is extraordinary government misconduct). State courts are similarly split. Compare *Leech* v. *State,* 66 P.3d 987, 990 (Okla. Crim. App. 2003), cert. denied sub nom. *Leech* v. *Hines,* 126 S. Ct. 1061 (2006) (recognizing defense), with *People* v. *Claypool,* 470 Mich. 715,

*monwealth* v. *Acevedo*, 446 Mass. 435, 443 (2006), the defendant would not be entitled to present a sentencing entrapment defense or to receive an instruction on sentencing entrapment.

None of the evidence that the defendant points to in his brief demonstrated government inducement to commit an offense greater than he was predisposed to commit. The fact that the undercover trooper could have arrested the defendant after the first drug transaction but chose not to was not improper and does not demonstrate inducement. See *Commonwealth* v. *Garcia, supra* at 692 ("In order to pursue [police] work, an undercover officer must often develop a relationship of trust with a drug dealer by purchasing small quantities of narcotics over a long period of time"); *Sena* v. *Commonwealth*, 417 Mass. 250, 256 (1994) ("The decisions of law enforcement officers regarding . . . whether and when to seek warrants for arrest . . . [s]o long as they are within the bounds of the law, and therefore within the officers' discretion . . . are public policy decisions").

The defendant failed to show that the trooper or the informant's behavior toward the defendant from August 3 until the drug transaction on August 6 rose to the level of inducement entitling him to an instruction on sentencing entrapment. See *Commonwealth* v. *Tracey*, 416 Mass. 528, 536 (1993). See also *United States* v. *Ryan*, 289 F.3d 1339, 1344-1345 (11th Cir.), cert. denied, 537 U.S. 927 (2002) (sentencing entrapment instructions not warranted on evidence presented where government informant made increasingly favorable offers to sell marijuana to defendant until defendant agreed). The undercover trooper's contacting the defendant numerous times was not inducement. *Commonwealth* v. *Harvard*, 356 Mass. 452, 454, 460 (1969) (no entrapment where undercover agent telephoned defendant for marijuana and repeated request on four other occasions). The reservations that the defendant expressed about the transaction also did not establish inducement because the defendant stated that it was the owner of the cocaine who had

725-726 (2004) (declining to adopt sentencing entrapment doctrine but holding that departure from guidelines could be granted if defendant has enhanced intent that was product of police conduct).

expressed concern about going from sixty-two grams to a kilogram. Even if the defendant himself was concerned, there was no evidence that the trooper or the informant utilized excessive or improper inducement to quell that concern. In fact, the defendant actively sought out the trooper's help in setting up a drug distribution point on Cape Cod.

Further, the trooper's payment of $1,000 more than the agreed-on price for the drugs in order to ease the defendant's concerns did not constitute improper inducement beyond the defendant's predisposition. See *Commonwealth* v. *Garcia, supra* at 692, quoting *United States* v. *Connell,* 960 F.2d 191, 196 (1st Cir. 1992) ("By their nature, sting operations are designed to tempt the criminally inclined, and a well-constructed sting is often sculpted to test the limits of the target's criminal inclinations").

Admission of evidence of the defendant's small sale of drugs to an undercover officer in June, 1993, would not have demonstrated, as the defendant argues, that the government induced the defendant to traffic in a greater quantity of drugs, because the defendant would still have failed to meet his burden of showing behavior on the part of the government constituting inducement. Similarly, none of the other evidence that defense counsel stated that he would have elicited at trial if he were permitted to would have entitled the defendant to a sentencing entrapment instruction. The defendant's offer of proof was limited to questions about the trooper's subjective desire to charge the defendant with a greater offense, which does not provide any support for the defense of sentencing entrapment as defined in the defendant's own proposed instruction.[15]

Furthermore, we reject the defendant's argument that *Apprendi* v. *New Jersey,* 530 U.S. 466 (2000), requires that a defendant who presents evidence that a government agent

---

[15]In a postargument letter, the defendant argued, inter alia, that if he had been allowed to present a sentencing entrapment defense he would have adduced evidence about different types of drug dealers in the distribution chain and the defendant's work as a street-level dealer selling very small quantities of cocaine. The Commonwealth submitted a motion to strike the defendant's postargument letter. We need not address the Commonwealth's motion because the evidence that the defendant points to in the letter does not demonstrate inducement on the part of the government.

induced him to distribute a higher amount of narcotics than he was predisposed to distribute is entitled to a jury instruction on sentencing entrapment. As discussed above, the defendant did not present such evidence.[16] In any event, the *Apprendi* decision does not change the case law in this Commonwealth relative to sentencing entrapment. In the *Apprendi* decision, the United States Supreme Court held that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490. Here, the quantity of cocaine distributed, an element of the crime, *was* submitted to the jury and proved beyond a reasonable doubt.

There was no error in the judge's denial of the defendant's motion to present a defense of sentencing entrapment and in the judge's refusal to instruct the jury on sentencing entrapment.

2. *"Missing witness" instruction.* The defendant requested that the judge give a "missing witness" instruction to the jury relating to the Commonwealth's failure to call the informant as a witness. The judge declined, and the defendant argues that this was error. We disagree.

The decision whether to provide a missing witness instruction to the jury is within the discretion of the trial judge, and will not be reversed unless the decision was manifestly unreasonable. *Commonwealth* v. *Thomas*, 429 Mass. 146, 151 (1999). Although the degree of discretion is reduced when the missing witness instruction requested would be adverse to the Commonwealth, "[t]he absence of constitutional concerns underlying the call for caution . . . does not, of itself, remove the matter from the judge's discretion" (footnote omitted). *Commonwealth* v. *Smith*, 49 Mass. App. Ct. 827, 831-832 (2000).

A missing witness instruction is appropriate when a party "has knowledge of a person who can be located and brought forward, who is friendly to, or at least not hostilely disposed toward, the party, and who can be expected to give testimony of distinct importance to the case," and the party, without explanation, fails to call the person as a witness. *Commonwealth* v.

---

[16]For this reason, we will not address every argument that the defendant has asserted pertaining to sentencing entrapment.

*Anderson*, 411 Mass. 279, 280 n.1 (1991), quoting *Commonwealth* v. *Schatvet*, 23 Mass. App. Ct. 130, 134 (1986). The instruction permits the jury, "if they think reasonable in the circumstances, [to] infer that that person, had he been called, would have given testimony unfavorable to the party." *Id.* Therefore, a missing witness instruction should be provided "only in clear cases, and with caution." *Commonwealth* v. *Figueroa*, 413 Mass. 193, 199 (1992), *S.C.*, 422 Mass. 72 (1996), quoting *Commonwealth* v. *Schatvet, supra.* See *Commonwealth* v. *Franklin*, 366 Mass 284, 294 (1974) ("The effect of the [missing witness] comment may be substantial in the jury's deliberations. An inference which is unfairly urged or drawn may be decisive in the case"). Such an instruction should not be given where the Commonwealth has legitimate tactical reasons for not calling the witness. *Commonwealth* v. *Santos*, 440 Mass. 281, 294 (2003). See *Commonwealth* v. *Anderson*, *supra* at 282-283 ("if the circumstances, considered by ordinary logic and experience, suggest a plausible reason for nonproduction of the witness, the jury should not be advised of the inference").

Here, the judge's decision not to give a missing witness instruction was not manifestly unreasonable and did not constitute error. The Commonwealth had logical tactical reasons for deciding not to call the informant, considering that defense counsel had indicated his intent to attack the informant with prior convictions and an arrest, and the trial judge had stated that the impeachment evidence would be admissible if the informant testified.[17] See *Commonwealth* v. *Anderson, supra* at 284, quoting *Commonwealth* v. *Franklin, supra* ("We have said,

---

[17]We decline to rest our conclusion that there was no error in the judge's refusal to provide a missing witness instruction on the argument asserted by the Commonwealth that the informant was present in the court room, and where a witness is "equally available to parties on both sides of a dispute, no inference should be drawn against either side for failing to call the witness." *Commonwealth* v. *Hoilett*, 430 Mass. 369, 376 (1999), quoting *Commonwealth* v. *Cobb*, 397 Mass. 105, 108 (1986), and cases cited. Although we have generally recognized this principle, "there is no hard and fast rule to that effect," *Commonwealth* v. *Niziolek*, 380 Mass. 513, 518-519 (1980), and we have stated, in a case in which the alleged "missing" witness was present or outside the court house on at least two of the days of trial, that the fact that the party requesting the instruction itself could have called the witness did not

when urging caution in the area of giving a 'missing witness' instruction, that '[a] witness may be withheld because of his prior criminal record . . . .' ").

Relying on *Commonwealth* v. *Smith*, 49 Mass. App. Ct. 827 (2000), the defendant argues that the judge implicitly found that the foundational requisites for a missing witness instruction had been met when he permitted defense counsel to make the missing witness argument in closing.[18] In the *Smith* case, the Commonwealth failed to call nine witnesses who saw the person who allegedly committed the robbery and who could provide support for the victim's story. *Id.* at 828-829. The Commonwealth only elicited testimony from the victim and from police officers who had not personally witnessed the crime. *Id.* at 828. The trial judge rejected the defendant's request for a missing witness instruction but allowed defense counsel to argue that inferences adverse to the Commonwealth could be drawn from its failure to call certain witnesses. *Id.* at 828-829. The Appeals Court held that by permitting defense counsel to make the missing witness argument, the judge implicitly concluded that the foundational requisites for the instruction had been met. *Id.* at 830.

We agree with the general principle that the *Smith* case represents, that a missing witness instruction and argument are interrelated and should be evaluated in conjunction with one another. See *Commonwealth* v. *Sena*, 29 Mass. App. 463, 468 n.7 (1990) ("once a judge authorizes counsel at the charge conference to make a 'missing witness' comment to the jury, the judge also must give a 'missing witness' instruction to the jury"). That said, the *Smith* case is distinguishable from this situation. Whereas in *Smith* the Appeals Court concluded that

"render the adverse inference impermissible, because the [other party] was more closely acquainted with [the witness] and would 'be naturally expected to call' " him. *Commonwealth* v. *Thomas*, 429 Mass. 146, 151 (1999), quoting *Commonwealth* v. *Niziolek*, *supra* at 519. See *Commonwealth* v. *Rollins*, 441 Mass. 114, 119-120 (2004) (approving this language from *Commonwealth* v. *Thomas*, *supra*).

[18]The defendant also argues that comments made by the judge during trial and during the charge conference indicate that a missing witness instruction was appropriate. Given that the judge explicitly denied the request for a missing witness instruction, these comments do not convince us that judge intended to give such an instruction or that one was required in the circumstances.

the missing witness adverse inference was appropriate in the circumstances, *Commonwealth* v. *Smith, supra* at 830-831, and therefore that an instruction on the inference may have been required where the argument was permitted, in this case we have concluded that the inference and instruction were not required, given the Commonwealth's legitimate tactical reason for deciding not to call the informant. Thus, unlike in *Smith*, the record in this case does not require the conclusion that the judge's allowance of defense counsel's missing witness argument rendered the absence of a missing witness jury instruction an error. Indeed, as we shall explain, once it was determined that the judge would not give a missing witness instruction in this case, he should not have permitted counsel to make the missing witness argument to the jury.[19]

A missing witness instruction from a judge and a missing witness argument by counsel go hand in hand. If a judge determines that the foundational requirements for the instruction are met, and that the adverse inference is warranted on the facts of the case, the instruction informs the jury that they may infer from a party's failure to call a witness that the witness would have testified unfavorably to that party. Counsel may then urge the jury in closing argument affirmatively to draw that inference. But before giving the instruction, and before permitting counsel to argue the point, the judge must be satisfied that the foundational requirements for the instruction and argument are in fact met and that the adverse inference is warranted in the circumstances.[20] The same considerations apply in determining whether to permit the argument as apply in determining whether to give the instruction. See, e.g., *Commonwealth* v. *Resendes*, 30 Mass. App. Ct. 430, 432-433 (1991); *Commonwealth* v. *Vasquez*, 27 Mass. App. Ct. 655, 658 (1989); *Commonwealth* v.

---

[19]*Commonwealth* v. *Sena*, 29 Mass. App. 463 (1990), is likewise distinguishable. There was no question in that case that the missing witness adverse inference was warranted and, indeed, that the judge intended to instruct on it. See *id.* at 465-466, 467-468.

[20]Even where a sufficient foundation is established in the record, a judge may, in his or her discretion, decline to give the instruction or permit the argument in certain circumstances. See *Commonwealth* v. *Niziolek*, 380 Mass. 513, 518 n.2 (1980), quoting *Commonwealth* v. *Franklin*, 366 Mass 284, 294 (1974); *Commonwealth* v. *Sena*, 29 Mass. App. 463, 467 n.6 (1990). See also *Commonwealth* v. *Anderson*, 411 Mass. 279, 283 (1991).

*Schatvet*, 23 Mass. App. Ct. 130, 135 (1986). If the judge determines that a missing witness adverse inference is not appropriate in a given case, the jury should not, regardless whether by argument or by an instruction, be given the option of drawing that inference; in such circumstances the jury should not be instructed on the adverse inference, nor should counsel be given permission to argue it. Put another way, counsel should not be permitted to encourage the jury to draw the adverse inference after the judge has determined that the inference is not appropriate and he will not instruct on it.[21]

The judge in this case, as we have said, notwithstanding his refusal to give a missing witness instruction, permitted counsel to make a missing witness argument to the jury. The defendant argues that the judge's instructions — specifically, his telling the jury to confine their deliberations to "the evidence and only the evidence" and not to "speculate as to any unanswered questions you may have" — undermined his counsel's missing witness argument. While that may be true, see *Commonwealth* v. *Smith*, *supra* at 832 (holding that similar instructions effectively undercut defense counsel's argument urging jury to draw missing witness adverse inference; "[s]uch normatively appropriate instructions reasonably may have been construed by the jury as requiring them to reject the adverse inference suggested by defense counsel"), it did not prejudice the defendant. Once the judge in this case declined the defendant's request for a missing

---

[21]In this sense, the missing witness inference is different from other types of inferences, which a judge may allow to be argued during closing without providing a corresponding instruction. For example, a judge may permit argument that the failure of police to conduct certain tests or follow certain procedures created a reasonable doubt as to the defendant's guilt, *Commonwealth* v. *Bowden*, 379 Mass. 472, 485-486 (1980), and yet not give a specific instruction on the issue. See, e.g., *Commonwealth* v. *Simpson*, 434 Mass. 570, 591 (2001). The difference arises because the type of inference authorized in *Bowden* and the missing witness inference are not analogous. The missing witness inference is an adverse inference to be drawn against a party for choosing not to present certain testimony; the jury are invited to infer that the testimony would have been unfavorable to the party who failed to call the witness. The inference authorized in the *Bowden* case, by contrast, is based on the evidence presented — evidence of police failure to take certain investigatory steps — and focuses not on what the substantive content of missing evidence would have been, but only on the fact that there was missing evidence.

witness instruction, he should not have permitted counsel to make the missing witness argument. In making the argument, therefore, the defendant got more than he was entitled to in the first place.[22]

Nothing we say today prohibits a defense attorney from arguing to the jury, in a case where there is no missing witness instruction, that the Commonwealth has not produced sufficient evidence to warrant a conviction beyond a reasonable doubt. This is standard argument that can be made in any case. A defendant has wide latitude in every case to argue that the Commonwealth has failed to present sufficient evidence and, in this sense, that there is an "absence" of proof or that evidence is "missing." That is distinctly different from a missing witness argument, however. In the former, the defendant argues that the evidence that *has* been produced is inadequate; the defendant may even legitimately point out that a specific witness or specific evidence has not been produced; but the defendant does not argue or ask the jury to draw any conclusions as to the substance of the evidence that has not been produced. In the latter, the defendant points an accusatory finger at the Commonwealth for not producing the missing witness and urges the jury to conclude affirmatively that the missing evidence would have been unfavorable to the Commonwealth.[23] That is the essence of the adverse inference. See *Commonwealth* v. *Franklin*, 366 Mass. 284, 292 (1974) ("The negative inference involved is that a party's failure to produce those persons who could

---

[22]When a missing witness argument and instruction are correctly used together, there is no danger that the general instruction telling the jury not to speculate will undercut the argument. The missing witness instruction will specifically inform the jury that they are entitled to draw the adverse inference based on evidence that was not produced; the instruction is, in essence, presented as a specific, limited exception to the more general instruction that the jury are not to draw any conclusion about the content of evidence that was not produced. See Massachusetts Superior Court Criminal Practice Jury Instructions §§ 4.9.1, 4.9.2 (Mass. Continuing Legal Educ. 1999 & Supp. 2003). See also *Commonwealth* v. *Dwyer*, 448 Mass. 122, 134 n.13.

[23]The argument in this case was a classic missing witness argument, going well beyond any mere contention that there were gaps in the Commonwealth's case and insufficient evidence to convict beyond a reasonable doubt. Counsel plainly suggested that, by not calling the informant as a witness, the Commonwealth was trying to hide something, and he thus plainly implied that the informant's testimony would have been unfavorable to the Commonwealth.

clarify or support that party's version of the facts permits the jury to infer that the absent witnesses would, in truth, testify adversely to that party's interest"). It is a powerful accusation — that a party is withholding evidence that would be unfavorable — and that is why we regulate it closely and require judges to assess very carefully whether to give the instruction and to permit the argument in a given case.

3. *Joint venture instruction.* Over defense counsel's objection, the judge gave a joint venture instruction to the jury. We reject the defendant's argument that the judge erred in providing this instruction regarding the first drug sale because there was insufficient evidence to warrant the instruction.

In order to sustain a conviction under a theory of joint venture, the Commonwealth must present sufficient evidence to prove beyond a reasonable doubt that (1) the defendant was present at the scene of the crime, (2) with knowledge that another person intended to commit a crime or with intent to commit a crime, and (3) by agreement was willing and available to help the other person if necessary. *Commonwealth* v. *Green*, 420 Mass. 771, 779 (1995). The Commonwealth, therefore, must show that there was a principal other than the defendant who was involved in the drug transaction. *Id.*

The evidence was sufficient for the jury to have found each of these elements beyond a reasonable doubt. The defendant contends that there was no evidence that anyone other than the defendant was involved in the initial sale. However, it is a reasonable inference from the evidence that there was at least one person other than the defendant present in 48 Essex Street who was involved in the drug transaction. See *Commonwealth* v. *Berry*, 431 Mass. 326, 332 (2000) (jury may rely on reasonable inferences to support joint venture conviction); *Commonwealth* v. *Brooks*, 422 Mass. 574, 577 (1996) ("inferences drawn by the jury need only be reasonable and possible and need not be necessary or inescapable").

The undercover trooper testified that he was introduced to the defendant on August 3, 1993, for the purpose of negotiating the purchase of cocaine. On the drive to 48 Essex Street in Lynn, the trooper and the defendant discussed the quality of the cocaine that the trooper was purchasing. When the trooper, the

informant, and the defendant arrived at 48 Essex Street, the defendant told the trooper that if they were asked where they sell, "not to tell them because the people will go down there and take over [their] business."[24] The defendant then asked the trooper to give the money to the informant, which the trooper did after confirming the price, and the trooper observed the defendant and the informant walk to the rear of 48 Essex Street and enter through the porch area in the back. A few minutes later, the trooper saw the informant exit through the rear of 48 Essex Street, and the informant handed the trooper a plastic bag that contained sixty-two grams of cocaine. In addition, there was testimony that another person, Chepe, provided the sixty-two grams of cocaine that was sold to the trooper on August 3.

*Conclusion.* For the reasons set forth above, we find no merit to the defendant's claims of error, and affirm his convictions.

*So ordered.*

---

[24]The defendant argues that this statement merely suggests that someone with an interest in selling drugs might have been present in the house. However, considered in the context of the drive to 48 Essex Street and the conversation about the cocaine that the trooper was purchasing, the logical inference is that there were people at 48 Essex Street who were involved in the drug transaction with the defendant.