NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11656


COMMONWEALTH  vs.  DEMERY WILLIAMS.



Hampden.      November 6, 2015. - October 17, 2016.

Present:  Gants, C.J., Cordy, Botsford, Lenk, & Hines, JJ.[1]



Homicide.  Robbery.  Assault and Battery by Means of a Dangerous
    Weapon.  Joint Enterprise.  Felony-Murder Rule.  Evidence,
    Joint venturer, Wiretap, Admissions and confessions, Expert
    opinion.  Electronic Surveillance.  Constitutional Law,
    Speedy trial, Confrontation of witnesses.  Witness, Expert,
    Unavailability.  Cellular Telephone.  Deoxyribonucleic
    Acid.  Search and Seizure, Warrant.  Practice, Criminal,
    Capital case, Speedy trial, Admissions and confessions,
    Confrontation of witnesses, Instructions to jury,
    Assistance of counsel, Loss of evidence by prosecution.




    Indictments found and returned in the Superior Court
Department on September 26, 2011.

    The cases were tried before John J. Agostini, J.


    Kathleen M. McCarthy for the defendant.
    Katherine E. McMahon, Assistant District Attorney, for the
Commonwealth.


---

    [1] Justice Cordy participated in the deliberation on this
case prior to his retirement.

LENK, J.  The defendant was convicted as a joint venturer of murder in the first degree, armed robbery, and assault and battery by means of a dangerous weapon in connection with the death of William Jones in January, 2010.  On direct appeal from that conviction, he argues that his motions for required findings of not guilty should have been granted, and that his case should have been dismissed on speedy trial grounds.  In addition, he argues that certain evidence, including his statements to police, should not have been admitted at trial.  The defendant also seeks relief under G. L. c. 278, § 33E.  Having reviewed the entire record, we affirm the convictions and discern no reason to exercise our authority to grant extraordinary relief.

1.  Factual background.  We recite the facts the jury could have found, reserving certain details for later discussion.  At approximately 8 A.M. on January 22, 2010, the defendant, an employee at a tomato processing plant in Hartford, Connecticut, told his supervisor that he needed to leave work in order to conduct a drug deal.  The supervisor gave him permission to leave, and the defendant was picked up by Jones in a white Saturn sport utility vehicle (SUV).  The pair drove to a house on Florida Street in Springfield, where Jones, a drug dealer, had been led to believe that he would buy drugs from Curtis Combs, an acquaintance of the defendant.  The defendant,

however, knew that Jones was going to be robbed. He went into the house to introduce Jones to Combs, but returned outside to serve as a lookout.

The defendant heard "tussling" inside the house as well as a "zzzt, zzzt" sound. Combs then brought Jones out of the house while striking him in the back of the neck with a stun gun. After Jones was placed in the back seat of the Saturn, the defendant drove the vehicle to the parking lot of a grocery store in Bloomfield, Connecticut. The defendant left Jones in the Saturn, and was driven back to his workplace in another vehicle.

The defendant returned to work around 12:30 P.M. He told his coworkers that he had made a profit on the deal, and offered to buy them all lunch. In addition, he gave ten dollars each to his supervisor and to another coworker. At one point, he fanned out approximately $4,000 to $5,000, mostly in one hundred dollar bills. The following evening, Jones's body was found lying across the back seat of the Saturn in the grocery store parking lot. At trial, a medical examiner testified that the cause of his death was ligature strangulation.

The investigation of Jones's death was undertaken primarily by officers of the Bloomfield, Connecticut, police department over a two-week period in early 2010. While searching the Saturn pursuant to a warrant, police found the fingertip from a

latex glove on the floor beneath the back seat. Jones's and the defendant's deoxyribonucleic acid (DNA) profiles were both determined to be contributors to a DNA profile found on the glove fingertip, and to another DNA profile found on one of the headrests in the vehicle.[2] The defendant routinely wore latex gloves of the same type as part of his work at the tomato processing plant.

Officers of the Bloomfield police department first interviewed the defendant at his workplace on January 25, 2010. Unbeknownst to the defendant, one of the interviewing officers was carrying a pen recorder that audiotaped their conversation, as permitted under Connecticut law. The defendant told police that Jones had arranged to meet with him on January 22, 2010, but did not show up. He provided the police with a written, signed statement to that effect.

Video footage from the tomato processing plant, however, showed that the defendant was picked up from work in a white SUV, and dropped off again by a different vehicle around 12:30

---

[2] The expected frequency of individuals who could be a contributor to the deoxyribonucleic acid (DNA) profile on the latex glove fingertip was approximately 1 in 1.2 million in the African-American population, 1 in 2.6 million in the Caucasian population, and 1 in 4.4 million in the Hispanic population. The expected frequency of individuals who could be a contributor to the DNA profile on the headrest was approximately 1 in 1,800 in the African-American population, 1 in 2,500 in the Caucasian population, and 1 in 4,400 in the Hispanic population. Jones was apparently African-American, as is the defendant.

P.M on the day in question.  In addition, cellular site location information (CSLI) for Combs's and the defendant's cellular telephones supported an inference that, during that time period, the defendant had traveled from his workplace to Springfield to meet Combs, and that the pair had traveled back to the defendant's workplace via Bloomfield.

On February 2, 2010, police confronted the defendant with this evidence during a second interview at the Bloomfield police station, which also was recorded without his knowledge by the same means.  As it became clear to the defendant that what he was saying conflicted with evidence police already had obtained, he changed his story several times.  Eventually, he explained that he had driven with Jones from his workplace to visit Combs in Springfield, on the understanding that Jones would be robbed.  He described the use of the stun gun and his role as a lookout, and stated that he had driven Jones to the grocery store parking lot.  He provided police with a written, signed statement summarizing that version of events as well.[3]  The defendant was not arrested at that time.

---

[3] Approximately one week into their investigation, Bloomfield police officers considered searching the house on Florida Street in Springfield.  They stopped pursuing this lead, however, after a Hampden County assistant district attorney informed them that he considered an application for a search warrant unlikely to succeed in Massachusetts because the information was "stale."

For reasons that are not clear from the record, the investigation then stalled until February, 2011, when a trooper of the Massachusetts State police was assigned to the case. The trooper interviewed several potential witnesses and obtained buccal swabs from the defendant and others that were used for additional DNA testing. In September, 2011, the Hampden County district attorney sought indictments against the defendant, and he was arraigned in Massachusetts on October 4, 2011.

2. Procedural posture. On September 26, 2011, a grand jury returned four indictments, charging the defendant with murder in the first degree, G. L. c. 265, § 1; kidnapping, G. L. c. 265, § 26; armed robbery, G. L. c. 265, § 17; and assault and battery by means of a dangerous weapon, G. L. c. 265, § 15A (b).[4] The Commonwealth proceeded on a joint venture theory of liability, with Combs as a joint venturer.[5] Prior to trial, a nolle prosequi was entered with respect to the kidnapping charge. The defendant filed a motion to dismiss the remaining charges on speedy trial grounds pursuant to Mass R. Crim. P. 36, as amended, 422 Mass. 1503 (1996). That motion was denied, and a petit jury was convened in the Superior Court.

---

[4] The bill of particulars stated that Jones was strangled to death by means of a ligature. The indictments for armed robbery and for assault and battery by means of a dangerous weapon both stated that the dangerous weapon used was a stun gun.

[5] Combs was tried separately.

At the close of the Commonwealth's case, the defendant filed a motion for a required finding of not guilty, which was denied. The defendant's theory of the case was based on the inadequacy of the investigation and on the insufficiency of the evidence; he did not introduce any evidence.

The defendant was convicted on all charges. His conviction of murder in the first degree was based on two theories: felony-murder based on the predicate felony of armed robbery, and extreme atrocity or cruelty. Immediately after the verdict, the defendant filed a motion for a required finding of not guilty, pursuant to Mass. R. Crim. P. 25, as amended, 420 Mass. 1502 (1995), which also was denied. This appeal followed.

3. Discussion. The defendant argues that the denials of his motions for required findings and his motion to dismiss on speedy trial grounds were error. He also argues that the judge erred in admitting certain evidence: the defendant's recorded statements to police and transcripts of those statements; the testimony of a substitute medical examiner; cellular telephone records; and DNA evidence taken from the latex glove fingertip. In addition, he seeks relief pursuant to G. L. c. 278, § 33E. These issues are addressed in turn below.

a. Sufficiency of the evidence. The defendant contends that there was insufficient evidence to convict him as a joint venturer with respect to any of the indictments. In reviewing

the denial of a motion for a required finding, we consider "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (emphasis in original).  Commonwealth v. James, 424 Mass. 770, 784 (1997), quoting Commonwealth v. Latimore, 378 Mass. 671, 677 (1979).  "[T]he evidence and the inferences permitted to be drawn therefrom must be 'of sufficient force to bring minds of ordinary intelligence and sagacity to the persuasion of [guilt] beyond a reasonable doubt.'"  Commonwealth v. Semedo, 456 Mass. 1, 8 (2010), quoting Commonwealth v. Latimore, supra.

Because the defendant was convicted as a joint venturer, to affirm the denial of the motion for a required finding we must conclude that the evidence was "sufficient to permit a rational juror to conclude beyond a reasonable doubt that the defendant knowingly participated in the commission of the crime[s] charged, with the intent required to commit the crime[s]." Commonwealth v. Zanetti, 454 Mass. 449, 468 (2009).

i.  Felony-murder.  The defendant contends that the evidence was insufficient to prove that he was a joint venturer in an armed robbery that resulted in Jones's death.[6]  To find the defendant guilty of murder in the first degree on a theory of

_____

[6] See Commonwealth v. Rodriquez, 454 Mass. 215, 216 n.3 (2009) (noting that armed robbery can be underlying felony for felony-murder).

felony-murder with armed robbery as the predicate felony, a rational juror must have been able to find beyond a reasonable doubt that the defendant was a joint venturer in an armed robbery and that Jones's death occurred "in the commission or attempted commission of" that robbery. See G. L. c. 265, § 1; Zanetti, supra at 468.

To find the defendant guilty of the underlying felony of armed robbery, proof was required that at least one of the alleged coventurers was armed with a dangerous weapon; either applied actual force or violence to Jones's body, or by words or gestures put him in fear; took Jones's money or property; and did so with the intent (or sharing the intent) to steal it. See Commonwealth v. Benitez, 464 Mass. 686, 689-690 (2013), citing Commonwealth v. Rogers, 459 Mass. 249, 252 n.4, cert. denied, 132 S. Ct. 813 (2011). In the absence of proof that the defendant himself was armed with a dangerous weapon, proof that the defendant knew that Combs was so armed would satisfy the first element of armed robbery. See Benitez, supra at 689 n.4, citing Commonwealth v. Fickett, 403 Mass. 194, 196-197 (1988). In the defendant's view, there was no evidence that Jones was killed in the commission of a robbery, that the defendant knew

that Combs would use a stun gun during the robbery,[7] or that anything was taken from Jones.

We disagree. The defendant told police that he knew Combs would rob Jones, that he saw Combs repeatedly assault Jones with a stun gun, and that he drove an injured Jones to Bloomfield, Connecticut. In addition, a witness testified that on the day Jones was killed he had observed Combs and another African-American man at the house on Florida Street in Springfield, excitedly looking at something in the back seat of the Saturn. This evidence would have allowed a rational juror to conclude that Jones was killed in the commission of an armed robbery. Because Jones knew the defendant, an inference reasonably could be drawn that the defendant had an incentive to ensure that Jones would not retaliate after being robbed. Although the defendant claimed that Jones was still alive during the drive to Bloomfield, he repeatedly changed his story during his interviews with police. It would have been reasonable to infer that an incapacitated Jones was killed in Springfield in the

---

[7] The defendant also argues on this basis that there was insufficient evidence for the jury to conclude beyond a reasonable doubt that he was a joint venturer in an assault and battery by means of a dangerous weapon against Jones. That argument is unavailing for the same reasons discussed below.

course of the robbery, during or shortly after Combs's sustained assault with the stun gun.[8]

Furthermore, there was sufficient evidence that the defendant knew Combs was armed with the stun gun. Cellular telephone records indicated that the defendant had been in contact with Combs on the day before and at relevant times on the day of the robbery, suggesting that he had played a significant role in planning to rob Jones. The defendant knew that Jones was a large man and that Jones intended to take part in a drug deal. A rational jury therefore reasonably could infer that the defendant and Combs planned to use a weapon to overpower Jones when he arrived in Springfield. See Commonwealth v. Housen, 458 Mass. 702, 708 (2011) (evidence sufficient to support inference that defendant knew codefendant was armed where victim was drug dealer unlikely to submit to robbery without show of superior force). Even if the defendant had been unaware in advance that Combs would be armed, however, he told police that he saw Combs using the stun gun on Jones before he drove Jones to Bloomfield. The defendant's knowledge of the use of the weapon and continued participation in the robbery thereafter were sufficient to implicate him as a joint venturer. Compare Commonwealth v. Norris, 462 Mass. 131, 140

---

[8] As discussed below, it also would have been reasonable to infer that a ligature ultimately was used to cause Jones's death.

(2012) (evidence sufficient to conclude that defendant was joint venturer in armed robbery where defendant continued to participate in robbery after learning codefendant was armed).

Although defense counsel emphasizes that money Jones previously had hidden in his home was not taken during the alleged robbery, the defendant returned to work on January 22, 2010, with what appeared to be a windfall profit.  The money he showed off to his coworkers reasonably could be inferred to have been taken from Jones, because the defendant told police that he had lured Jones to Springfield with the promise that he could purchase drugs there.

ii.  <u>Extreme atrocity or cruelty</u>.  The defendant also argues that the evidence was insufficient to convict him as a joint venturer of murder in the first degree on a theory of extreme atrocity or cruelty because no evidence showed that he participated in the strangulation of Jones by ligature, or that Jones's murder was extremely atrocious or cruel.

"The critical question with respect to whether the evidence was sufficient to warrant a finding that a defendant is guilty of murder in the first degree as a joint venturer on the theor[y] of . . . extreme atrocity or cruelty is whether the defendant was present at the scene of the murder, with the knowledge that another intends to commit a crime or with intent to commit the crime and by agreement was willing and available

to assist if necessary." Commonwealth v. Deane, 458 Mass. 43, 50 (2010), citing Commonwealth v. Phillips, 452 Mass. 617, 633 (2008). The Commonwealth need not prove, however, "exactly how a joint venturer participated in the murder[], or which of the two did the actual killing." Deane, supra at 50-51.

Murder on a theory of extreme atrocity or cruelty only requires a mens rea of malice. See Commonwealth v. Garcia, 470 Mass. 24, 32 (2014). "Malice is defined in these circumstances as an intent to cause death, to cause grievous bodily harm, or to do an act which, in the circumstances known to the defendant, a reasonable person would have known created a plain and strong likelihood that death would follow." Id., quoting Commonwealth v. Szlachta, 463 Mass. 37, 45-46 (2012). A defendant does not have to have known that his or her joint venturer possessed the murder weapon. See Commonwealth v. Pov Hour, 446 Mass. 35, 42 (2006). Furthermore, he or she need not have known or intended that the murder be extremely atrocious or cruel. See Garcia, supra.

Viewing the evidence in the light most favorable to the Commonwealth, a rational juror reasonably could have concluded that the defendant was present at the scene of Jones's murder. The defendant told police he had escorted Jones into the house on Florida Street to introduce Jones to Combs. Other evidence indicated that that the defendant had been in physical contact

with Jones in the Saturn:  both the defendant's and Jones's DNA profiles were present on the latex glove fingertip that was found on the floor in the back seat of the vehicle.  In addition, when Jones was found lying on his stomach across the back seat of the vehicle, his feet were pressed up against the door.  Given Jones's size, it would be reasonable to infer that he had been put into the vehicle forcibly with the defendant's help, and that he was at least incapacitated by the stun gun if not already strangled when he was put there.

While "[t]he line that separates mere knowledge of unlawful conduct and participation in it, is 'often vague and uncertain,'" Norris, 462 Mass. at 140, quoting Commonwealth v. Longo, 402 Mass. 482, 487 (1988), the evidence also allowed for the reasonable conclusion that the defendant either knew that Combs intended to kill Jones or himself intended to cause Jones death or grievous bodily harm.  Jones knew only the defendant, not Combs; the defendant thus had a greater incentive than Combs to ensure that Jones would not retaliate.  Furthermore, it is evident that the defendant wore latex gloves while in contact with Jones, inferably to avoid leaving fingerprints.  In addition, the defendant's changing story to police and others regarding what happened on the day of Jones's death allowed a reasonable inference that the defendant was conscious of his guilt.

There was also sufficient evidence from which a jury could have concluded that Jones's death was extremely atrocious or cruel. To determine that a homicide was committed with extreme atrocity or cruelty, a jury must consider several factors: a defendant's or joint venturer's "indifference to or taking pleasure in the victim's suffering, consciousness and degree of suffering of the victim, extent of physical injuries, number of blows, manner and force with which delivered, instrument employed, and disproportion between the means needed to cause death and those employed." Commonwealth v. Cunneen, 389 Mass. 216, 227 (1983). While a jury must find at least one of the Cunneen factors to support a verdict of extreme atrocity or cruelty, see Commonwealth v. Blackwell, 422 Mass. 294, 299 (1996), they need not be unanimous with respect to which factor or factors they determine to be applicable. See Commonwealth v. Morganti, 455 Mass. 388, 407 (2009), S.C., 467 Mass. 96 (2014).

The jury heard testimony that Jones was assaulted repeatedly with a stun gun and eventually strangled to death. They also heard that it would have taken eight to ten seconds of sustained strangulation to cause Jones to lose consciousness, and several more minutes for strangulation to cause death, and that his injuries were consistent with terminal seizure activity, in which a person being strangled twitches and bites his lips as he dies. See Commonwealth v. Linton, 456 Mass. 534,

546-547 (2010) (reasonable jury could find victim's homicide by means of manual strangulation was extremely atrocious or cruel). This evidence would have allowed the jury reasonably to apply several of the Cunneen factors.[9]

b. Speedy trial. The defendant argues that his motion to dismiss on speedy trial grounds was incorrectly denied, because his trial was delayed repeatedly for over one year. Pursuant to Mass R. Crim. P. 36 (b), as amended, 422 Mass. 1503 (1996), a defendant is entitled to dismissal if a trial does not take place within twelve months of the defendant's arraignment.[10] However, a period of delay does not count toward the twelve-month maximum if a defendant acquiesced in or benefited from it. See Commonwealth v. Roman, 470 Mass. 85, 92-93 (2014).

We consider the defendant's motion to dismiss on speedy trial grounds de novo. See Commonwealth v. Rodgers, 448 Mass. 538, 540 (2007). "For purposes of a rule 36 calculation of excludable periods, the docket and the clerk's log are prima facie evidence of the facts recorded therein." Roman, supra at 93. Because 518 days passed between October 4, 2011, the

---

[9] Furthermore, the defendant told police that, when he left Jones in the parking lot, he was still making "little noises." If the jury believed this statement, they reasonably could have inferred from it that the defendant was indifferent to Jones's suffering.

[10] See Mass. R. Crim. P. 2 (b) (15), as amended, 397 Mass. 1226 (1986) (defining "return day" as date of arraignment).

date the defendant was arraigned, and March 5, 2013, the date he filed his motion to dismiss, the defendant has established a prima facie case that his speedy trial right was violated.[11]  The Commonwealth therefore has the burden of showing that at least 152 days of the delay should not count toward the twelve-month maximum.[12]  See id. at 92 (shifting burden to Commonwealth to justify delay after defendant establishes prima facie case).

That burden has been met in this case.  "When a defendant has agreed to a continuance, or has not entered an objection to delay, he will be held to have acquiesced in the delay."  Barry v. Commonwealth, 390 Mass. 285, 298 (1983).  See Roman, supra at 93.  Here, it is evident from the docket and the clerk's log that the defendant and the Commonwealth jointly requested to continue the pretrial hearing date from March 14, 2012, to April 23, 2012 -- a delay of forty-one days.  They also agreed to extend the deadline for filing pretrial motions from April 30, 2012, to August 13, 2012 -- a delay of an additional 106 days.  Moreover, they jointly requested to continue the trial date from December 3, 2012, the date they had jointly proposed in the pretrial conference report, to April 1, 2013.  The

---

[11] See Mass R. Crim. P. 36 (b) (3), as amended, 422 Mass. 1503 (1996) ("In computing any time limit other than an excluded period, the day of the act or event which causes a designated period of time to begin to run shall not be included").

[12] The year 2012 was a leap year.

defendant thus had acquiesced to an additional period of delay of at least 120 days when, on March 5, 2013, he filed his motion to dismiss on speedy trial grounds. Other delays may also have been permitted, but we need not address them here. The delays described above already substantially exceed the number of days the Commonwealth must justify.

c. Defendant's statements to police. As noted, police audiorecorded both of their interviews of the defendant without his knowledge, using a pen recorder.[13] After the defendant filed an unsuccessful motion in limine to exclude the interviews from evidence, the contents of the interviews were admitted in several ways at trial, over repeated objection. The officer who recorded the interviews read excerpts from the transcripts of those recordings to the jury; she also read the several written statements that the defendant signed in her presence.[14] The transcript excerpts and written statements also were admitted in evidence separately. Furthermore, the unredacted recordings of

_____

[13] The record does not indicate whether the defendant was informed of the Miranda rights prior to either interview. The defendant did not, however, move to suppress the statements on Miranda grounds. He requested and received a humane practice instruction at trial.

[14] The officer also testified regarding her perception of the defendant's demeanor during the interviews, including her belief that the defendant was "relaxed" and not under the influence of drugs or alcohol.

the interviews were marked as exhibits, and redacted recordings were available to the jury upon request during deliberations.

The defendant argues that the contents of his oral statements to police should not have been admitted,[15] and contests the manner in which they were admitted. For the reasons that follow, we conclude that the judge did not abuse his discretion either in the admission of the statements themselves or in the ways they were admitted.

i. Admission of statements. The recordings of the defendant's statements to police were not complete -- the officer who was carrying the recording device left the interview room at least once during the second interview. Accordingly, the defendant contends that his statements should not have been admitted because the recordings were incomplete, and because they were recorded without his knowledge or consent. Reviewing the admission of the defendant's statements for abuse of discretion, however, we discern no error.[16] See Commonwealth v. Valentin, 420 Mass. 263, 270 (1995), S.C., 470 Mass. 186 (2014).

_____

[15] Although the defendant preserved objections to the admission of his written, signed statements to police, he does not raise these arguments on appeal. We discern no error in their admission.

[16] In his order denying the motion in limine, the trial judge erroneously stated that the audiorecordings were complete recordings of the defendant's interviews with police. Nonetheless, we conclude that the statements were properly admitted. See Commonwealth v. Bennett, 414 Mass. 269, 271

Although the lack of a complete recording of a defendant's statements to police at times may be problematic, completeness is not a prerequisite for admission. See Commonwealth v. DiGiambattista, 442 Mass. 423, 449 (2004). Instead, "a defendant whose interrogation has not been reliably preserved by means of a complete electronic recording should be entitled, on request, to a cautionary instruction concerning the use of such evidence." Id. at 447. Such an instruction was given in this case: the jury were told to consider the defendant's alleged statements with "great care and caution." Furthermore, the fact that the recordings were made without the defendant's knowledge was not a basis to exclude them from the evidence in this case. Although secret recordings sometimes may be misleading, there is no indication that the defendant would have acted differently had he been aware that he was being recorded. To the contrary, he signed several written statements that memorialized the versions of what had happened that he related to police.

The defendant also argues, for the first time on appeal, that the recordings were made in violation of G. L. c. 272, § 99, the Massachusetts wiretap statute. General Laws c. 272, § 99, provides a suppression remedy in Massachusetts for the

(1993), citing Aetna Cas. & Sur. Co. v. Continental Cas. Co., 413 Mass. 730, 734 (1992) ("We decline . . . to rest our conclusion on the ground on which the trial judge relied but reach the same result for a different reason").

unlawful interception of communications by police. Communications intercepted by Federal law enforcement officers are explicitly exempted from that remedy if the officers are "acting pursuant to authority of the laws of the United States and within the scope of their authority."  G. L. c. 272, § 99 D 1 c.  The defendant argues that, because the statute does not contain a similarly explicit exemption for law enforcement officers of another State acting pursuant to that State's laws, the recordings at issue here should have been suppressed.

Nonetheless, "[t]he legality of the procedures employed by the police forces of other States operating in their own jurisdiction is governed by the law of that jurisdiction." Commonwealth v. Scoggins, 439 Mass. 571, 578 (2003).  The recordings at issue here were made by Connecticut police officers in Connecticut more than one year before Massachusetts law enforcement officers became involved in the investigation. Nothing in the record suggests that the recordings were made with the knowledge or at the behest of the Commonwealth. Because the police are permitted to record interviews secretly under Connecticut law, no suppression remedy is available.  See Conn. Gen. Stat. § 53a-187(b).  See also State v. DelVecchio, 191 Conn. 412, 430-432 (1983) (no suppression remedy under Connecticut Constitution for secretly recorded statements).

ii.  Manner of admission.  The defendant argues that the
interview transcripts were presented improperly to the jury "in
lieu" of the recordings rather than as an interpretive
supplement to them.  Relatedly, he argues that it was error to
admit redacted versions of the recordings after the close of
evidence, rather than through a witness, and before he had had a
chance to review them.

Properly authenticated transcripts of recordings, however,
may be "offer[ed] . . . in evidence or for identification as an
aid to the finder of fact."  Commonwealth v. Portillo, 462 Mass.
324, 327 (2012).  Here, the transcripts that were read in
evidence had been prepared by an official court reporter at the
defendant's request.[17]  In addition, there was no error in the
eventual admission of the redacted recordings.  The unredacted
recordings previously had been authenticated and marked as an
exhibit; it is evident that the redacted recordings were
admitted simply to reflect redactions to the transcript that had
been agreed to before trial.  See Commonwealth v. Rogers, 459
Mass. 249, 268, cert. denied, 132 S. Ct. 813 (2011) (admission
of cumulative evidence "fall[s] within the judge's discretion").
In any event, the record does not indicate that the jury ever
asked to listen to the recordings, and the defendant does not

_____

[17] The Commonwealth also had a transcription of the
recordings prepared by a court reporter, but agreed to use the
defendant's version.

suggest otherwise. Any error in their admission therefore would have been harmless.

d. Substitute medical examiner. Before trial, the Connecticut medical examiner who conducted Jones's autopsy and prepared the autopsy report, Dr. Frank Evangelista, was indicted in Massachusetts for perjury and obstruction of justice in an unrelated matter.[18] Although Evangelista was available to testify, the Commonwealth opted instead to present testimony from a substitute medical examiner, Dr. Joann Richmond, a retired forensic pathologist, regarding the cause of Jones's death. The defendant repeatedly objected to the admission of this testimony.[19] Nonetheless, Richmond ultimately was allowed to testify regarding the nature of Jones's injuries, and to offer her opinion concerning the cause of his death. Evangelista's autopsy report was not offered or admitted in evidence.

On appeal, the defendant argues that the admission of testimony by a substitute medical examiner, despite the

---

[18] The district attorney for the Plymouth district brought those indictments.

[19] The defendant filed a motion in limine and a supplemental motion in opposition to the Commonwealth's motion to permit testimony by a substitute medical examiner. In addition, the defendant objected to the admission of the testimony during pretrial hearings, and moved to strike the testimony. The defendant also objected to the substitute examiner's opinion testimony regarding the cause of the victim's death.

availability of the original examiner, violated his constitutional confrontation rights.  In addition, he argues that the substitute testimony should not have been admitted because it was not scientifically reliable.  He also contends that the jury should have been given a missing witness instruction to account for the absence of Evangelista's testimony.

i.  Right of confrontation.  The Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights both provide criminal defendants with the right to be confronted with the witnesses against them.  Neither the fact that the original examiner was available to testify nor the contents of the substitute examiner's testimony, however, violated that right.

The defendant argues that the Commonwealth's use of a substitute medical examiner in this case impermissibly prevented him from calling Evangelista's credibility into question on cross-examination.  Nonetheless, "[w]e have never stated that a substitute medical examiner may not testify to his or her own opinions unless the medical examiner who performed the autopsy is shown to be unavailable, nor is there any rule of criminal procedure setting forth such a requirement."  Commonwealth v. Reavis, 465 Mass. 875, 881-882 (2013).  Because the Commonwealth did not offer testimonial out-of-court statements by Evangelista

in this case, the defendant had no constitutional right to confront those statements.

A substitute medical examiner may not testify to facts in an autopsy report if that report has not been admitted in evidence.  See Commonwealth v. Durand, 457 Mass. 574, 584-585 (2010), citing Commonwealth v. Nardi, 452 Mass. 379, 391 (2008).  A substitute examiner may, however, "offer an opinion on the cause of death, based on his [or her] review of an autopsy report by the medical examiner who performed the autopsy and his review of the autopsy photographs, as these are documents upon which experts are accustomed to rely, and which are potentially independently admissible through appropriate witnesses."  Reavis, supra at 883, citing Commonwealth v. Emeny, 463 Mass. 138, 145 (2012).  That is what happened here.

As noted, Evangelista's autopsy report as to Jones was not offered against the defendant, and Richmond did not testify to facts it contained.  Rather, she based her testimony on her independent understanding as a pathologist of both the report and photographs of Jones's injuries from the crime scene and autopsy.  For example, she testified that the photographs showed petechial hemorrhaging in Jones's eyes, as well as bleeding and bruising injuries that were consistent with terminal seizure-like activity.  In addition, she testified that, in her opinion, Jones died of "ligature strangulation."  Furthermore, the

defendant had an opportunity to cross-examine Richmond, and questioned her vigorously concerning the bases of her opinions.[20] See Commonwealth v. Greineder, 464 Mass. 580, 594-595, cert. denied, 134 S. Ct. 166 (2013) (noting that confrontation right protects opportunity for meaningful cross-examination).  No more was constitutionally required.

ii.  Scientific reliability of substitute testimony.  The defendant argues that Richmond's testimony was scientifically unreliable because she did not perform Jones's autopsy herself. The trial judge, however, declined to exclude Richmond's testimony on this ground, and the defendant's objection at trial similarly was overruled.  In light of our conclusion above that there was no constitutional error, we review those determinations for abuse of discretion.  See Commonwealth v. Matthews, 450 Mass. 858, 871 (2008), citing Canavan's Case, 432 Mass. 304, 311 (2000).

The testimony of a scientific expert witness is not admissible if the reasoning or methodology underlying that testimony is not scientifically valid or cannot be applied properly to the facts at issue in a given case.  See

---

[20] On cross-examination, the substitute medical examiner acknowledged the deficiencies of substitute testimony:  she noted that as the primary examiner she would have personally examined the victim's body, and not simply relied on pictures from the autopsy, and would also have had the ability to make independent measurements and compare the width of a shoelace found at the crime scene to the marks on the defendant's neck.

Commonwealth v. Lanigan, 419 Mass. 15, 25-26 (1994), citing Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 592-593 (1993). See also Commonwealth v. Barbosa, 457 Mass. 773, 783 (2010), cert. denied, 563 U.S. 990 (2011) (listing foundational requirements for admission of expert testimony in criminal case). A judge need not conduct an extensive inquiry into the validity of an expert's testimony if, on the other hand, "the expert's methodology has previously been accepted as reliable in the relevant field." Commonwealth v. Sliech-Brodeur, 457 Mass. 300, 327 (2010), citing Commonwealth v. Shanley, 455 Mass. 752, 763 n.15 (2010).

The witness's status as a substitute examiner was not a sufficient basis to exclude her testimony. Richmond may have been less well positioned to assess the cause of Jones's death than the medical examiner who conducted his autopsy, but she applied accepted methods and understandings of forensic medicine in her independent assessment of the photographs of Jones's injuries at trial. The judge therefore did not abuse his discretion in determining that Richmond's testimony would be a reliable scientific opinion.

iii. Missing witness instruction. A missing witness instruction permits the jury, "if they think reasonable in the circumstances, [to] infer that that person, had he [or she] been called, would have given testimony unfavorable to the party."

Commonwealth v. Saletino, 449 Mass. 657, 668 (2007), quoting Commonwealth v. Anderson, 411 Mass. 279, 280 n.1 (1991). Such an instruction may be appropriate when a party "'has knowledge of a person who can be located and brought forward, who is friendly to, or at least not hostilely disposed toward, the party, and who can be expected to give testimony of distinct importance to the case,' and the party, without explanation, fails to call the person as a witness." Saletino, supra at 667, quoting Anderson, supra at 280 n.1. The instruction should be provided "only in clear cases, and with caution." Saletino, supra at 668, quoting Commonwealth v. Figueroa, 413 Mass. 193, 199 (1992), S.C., 422 Mass. 72 (1996). If a judge determines that a missing witness instruction is not appropriate, counsel are not permitted to argue the issue during closing. Saletino, supra at 670. That determination is reviewed for abuse of discretion. See id. at 667. See also L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).

The judge denied the defendant's request for a "missing witness" instruction with respect to Evangelista, and prohibited him from arguing the issue to the jury. The judge determined that the Commonwealth had a legitimate tactical reason for not calling Evangelista -- it wished to avoid relying on a witness who was under indictment by another district attorney's office.

That determination was not "outside the range of reasonable alternatives."  See L.L., supra.

e.  Admission of cellular telephone records.  At trial, CSLI for Combs's and the defendant's cellular telephones was admitted in evidence.  Call records for Combs's, Jones's, and the defendant's telephone numbers were also admitted.  The defendant argues for the first time on appeal that the call records and CSLI were not obtained pursuant to search warrants, in violation of his rights under the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights, and in violation of the Federal stored communications act, 18 U.S.C. § 2703 (2012).  He contends that his trial counsel was ineffective for failing to object to their admission on these bases.[21]  In addition, he challenges, as he did at trial, the qualifications of an expert witness who testified regarding the call records.

We discern no error in the admission of the CSLI and call records.  Contrary to the defendant's contention, the record shows the call records were obtained pursuant to search warrants in Connecticut.  Thus, there was no violation of the relevant

_____

[21] The defendant's trial counsel objected to the admission of the cellular site location information (CSLI) data only on the ground that the version of the data she had been sent before trial was formatted slightly differently from the version that was admitted.

constitutional and statutory requirements, and his trial counsel was not ineffective for failing to raise these arguments.

Furthermore, the judge did not abuse his discretion in allowing a sales manager at the defendant's cellular telephone service provider to testify regarding the contents of call records. See Commonwealth v. Frangipane, 433 Mass. 527, 533, 537 (2001) (reviewing preserved objection to admission of expert testimony for abuse of discretion). Although an expert witness may not testify to matters beyond his or her area of expertise or competence, id. at 533, the sales manager had been employed by the service provider for fifteen years and had been trained in reviewing customers' bills to interpret the type of call record information about which he testified. We discern no abuse of discretion in allowing this testimony.[22]

f. Admission of DNA evidence. The swab used for extracting raw DNA from the latex glove fingertip found in Jones's vehicle was consumed in its entirety before the police arrested the defendant. Although the defendant asked for DNA material for retesting during discovery, he was told repeatedly that no material existed. On April 24, 2013, however, days

_____

[22] The defendant's contention that the particular call records and CSLI introduced in this case are not business records is also baseless. See Smith v. Maryland, 442 U.S. 735, 744-745 (1979) (treating telephone call records as business records); Commonwealth v. Augustine, 467 Mass. 230, 232 (2014) (treating CSLI as business record).

before the trial was scheduled to begin, he learned for the first time that DNA material extracted from the swab remained available for further testing.  Although the judge indicated a willingness to continue the trial, the defendant neither performed such testing before the scheduled trial date nor sought a continuance to do so.  Instead, he sought unsuccessfully to exclude the results of the testing that had already been done on the swab.

The defendant argues that the Commonwealth violated its duty to preserve exculpatory evidence because he was unable to test raw DNA material from the swab independently, and because a defense expert was unable to observe the extraction process to ensure that proper protocols were followed.  A prosecutor's preservation duty, however, only "extend[s] to material and information in the possession or control of members of his [or her] staff and of any others who have participated in the investigation or evaluation of the case and who either regularly report or with reference to the particular case have reported to his [or her] office."  Commonwealth v. Daye, 411 Mass. 719, 734 (1992), quoting Commonwealth v. St. Germain, 381 Mass. 256, 261 n.8 (1980).  Here, the prosecutor had no control over the

testing of the swab at the time the raw DNA was consumed.[23]
Thus, the preservation duty did not apply.

A defendant "'may be independently entitled to a remedy' of
exclusion if the loss or destruction of evidence was due to the
bad faith or reckless acts of the Commonwealth."  Commonwealth
v. Sanford, 460 Mass. 441, 447 (2011), citing Commonwealth v.
Williams, 455 Mass. 706, 718 (2010).  Such a remedy is not,
however, available in this case.  Although the defendant
received late notice of the availability of extracted DNA
material for testing, the exhaustion of the raw DNA material on
the swab was not due to that delay.  Nor was the defendant
prevented from testing the extracted DNA material that remained
available.

g.  Relief pursuant to G. L. c. 278, § 33E.  We have
examined the record carefully pursuant to our duty under G.L.

_____

[23] The swab used for extracting DNA from the latex glove
fingertip found in Jones's vehicle was first tested by the DNA
unit of the Connecticut forensic laboratory on June 21, 2010.
However, a scientist at the laboratory eventually determined
that the "typing kit" initially used on the swab may have been
"substandard or potentially compromised," requiring retesting.
Because retesting would extract all remaining raw DNA material
on the swab, the scientist contacted the Bloomfield,
Connecticut, police department to determine whether a suspect
had been arrested who should be given an opportunity to observe
the testing.  She was told that there was a person of interest
in the case, but that no arrests had been made.  On January 20,
2011, she retested the swab.  As noted above, Massachusetts
State police did not assume an active role in the investigation
until February, 2011, and the defendant was not arraigned in
Massachusetts until October, 2011.

c. 278, § 33E, and discern no basis on which to grant the defendant relief.[24]

Judgments affirmed.

---

[24] The defendant asks that we vacate his conviction of armed robbery because it is a lesser included offense of, and therefore merges with, the murder conviction.  This request does not account for the defendant's conviction of murder on the theory of extreme atrocity or cruelty.  "[W]here, as here, the conviction of murder is based on a theory in addition to the theory of felony-murder, the conviction of the underlying felony stands."  Commonwealth v. Brum, 441 Mass. 199, 200 n.1 (2004), citing Commonwealth v. Pennellatore, 392 Mass. 382, 390 (1984).