NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11724

COMMONWEALTH  vs.  CURTIS COMBS.


Hampden.      December 8, 2017. - July 5, 2018.

Present:  Gants, C.J., Gaziano, Lowy, & Cypher, JJ.


Homicide.  Accessory and Principal.  Jurisdiction, Of crime.


Indictments found and returned in the Superior Court
Department on September 26, 2011.

The cases were tried before Richard J. Carey, J., and a
motion for a new trial, filed on August 31, 2015, was heard by
him.


Cathryn A. Neaves for the defendant.
David L. Sheppard-Brick, Assistant District Attorney, for
the Commonwealth.


CYPHER, J.  In September, 2011, a Hampden County grand jury

returned four indictments charging the defendant, Curtis Combs,

with murder in the first degree, G. L. c. 265, § 1; kidnapping,

G. L. c. 265, § 26; armed robbery, G. L. c. 265, § 17; and

assault by means of a dangerous weapon, G. L. c. 265, § 15A (b).[1] The Commonwealth alleged that the defendant either was the principal or acted as part of a joint venture with Demery "Manny" Williams[2] to rob and murder William Jones. The defendant and Manny were tried separately, and we affirmed Manny's convictions of murder in the first degree, armed robbery, and assault and battery by means of a dangerous weapon. See Commonwealth v. Williams, 475 Mass. 705, 706 (2016). At the defendant's trial, the theory of defense was that he was not involved in killing the victim and had only assisted Manny in concealing the crime after the fact, by helping Manny dispose of the victim's body in Connecticut.[3] The jury ultimately convicted the defendant of murder in the first degree on the theories of deliberate premeditation and extreme atrocity or cruelty, as well as of assault and battery by means of a dangerous weapon.[4]

---

[1] The Commonwealth filed a nolle prosequi as to the kidnapping charge before trial.

[2] We refer to Demery "Manny" Williams as "Manny" to avoid confusion with the victim, William Jones.

[3] The defendant was not charged as an accessory after the fact.

[4] The judge sentenced the defendant to life imprisonment without the possibility of parole on the murder conviction, and refrained from imposing a separate sentence with respect to the conviction of assault and battery by means of a dangerous weapon, reasoning that it merged with the murder conviction.

The defendant appeals from the two convictions and from the denial of his motion for a new trial. He claims that (1) the evidence was insufficient to convict him of murder; (2) the jury should have been instructed on accessory after the fact, even though the defendant was not charged with being an accessory after the fact; (3) errors in the prosecutor's closing argument require a new trial; and that (4) we should exercise our power under G. L. c. 278, § 33E, to reduce the verdict of murder in the first degree or grant the defendant a new trial.

This case presents the exceedingly rare instance in which the factual question "[w]hether a criminal act occurred within the territorial boundaries of the Commonwealth, and thus whether the Commonwealth has jurisdiction over the [defendant,]" is legitimately in dispute. Commonwealth v. Gilbert, 366 Mass. 18, 28 (1974). Throughout trial, and as part of his motion for a required finding of not guilty, the defendant argued that there was insufficient evidence to prove beyond a reasonable doubt that the victim was killed in Massachusetts. The judge denied the motion, yet submitted the question of territorial jurisdiction to the jury. Upon our review of the evidence, and even after viewing that evidence in the light most favorable to the Commonwealth, we agree with the defendant that the location of the crimes -- whether they occurred in Massachusetts or Connecticut (where the victim's body was found) -- remains too

speculative to sustain the jury's finding of guilt beyond a reasonable doubt.  "[T]here can be no doubt that [our courts have] no power to try the defendant for crimes committed out of State."  Commonwealth v. DiMarzo, 364 Mass. 669, 671 (1974).  Lacking territorial jurisdiction over the prosecution, we are required to reverse the defendant's convictions.[5]

Facts.  We recite the facts the jury could have found, viewing the evidence in the light most favorable to the Commonwealth, while reserving certain details for later discussion.  At approximately 10:20 A.M. on January 22, 2010, Jones, the victim, picked up Manny from his place of work in Hartford, Connecticut.[6]  The victim was driving a white Saturn Outlook sport utility vehicle (SUV) that he had rented the previous day.  Both men sold cocaine, and they had arranged a drug deal.  The plan also involved the defendant, Curtis Combs, who Manny knew previously.[7]  Despite being on probation in

---

[5] This opinion has no effect on our decision upholding Manny's convictions in Commonwealth v. Williams, 475 Mass. 705, 706 (2016).  The coventurers were tried separately, and evidence relevant to territorial jurisdiction was introduced at Manny's trial that was not introduced in the defendant's trial.  See note 21, infra.

[6] Manny sorted tomatoes at a processing plant for a produce company.  The job required him to wear latex gloves for sanitary purposes.

[7] Although the exact nature of the coventurers' relationship is unclear, the defendant later told police that he knew Manny from a barbershop in Hartford.  Cellular telephone (cell phone)

Connecticut, which prohibited him from leaving that State, the defendant was staying at his girl friend's apartment in Springfield. The victim and Manny drove to the Springfield apartment, arriving sometime shortly before 11 A.M.[8] The jury could reasonably infer that the victim was alive when they arrived at the Springfield apartment.[9] Around this time, Gustavo Bautista returned home to the duplex that he owned on Florida Street in Springfield. Bautista lived in the apartment located on the right side of the house, and he rented the left-side

---

evidence shows that Manny and the defendant exchanged several calls the night before and morning of January 22, 2010. In two of these exchanges, Manny called the defendant immediately before or after calling the victim, supporting an inference that the defendant was also involved in the drug deal. There is no evidence, however, that the defendant knew or exchanged calls with the victim, or that he possessed any motive to kill the victim.

[8] At 10:40 A.M., Manny called the defendant, with Manny's cell phone connecting to a tower alongside Interstate Route 91 somewhere between Hartford, Connecticut, and Springfield. Manny called the defendant again at 10:48 A.M., at which point both Manny's and the defendant's cell phones connected to towers in the Springfield area.

[9] The defense theory at trial was that Manny had killed the victim before leaving Connecticut, and arrived at the defendant's girl friend's apartment with the body. Viewing the evidence in the light most favorable to the Commonwealth, however, the jury could infer that the victim was still alive when he and Manny arrived in Springfield. Testimony established that the victim was driving a white Saturn Outlook sport utility vehicle (SUV) when he and Manny left Hartford. In addition, the defendant told police that Manny arrived at the apartment with a friend, and that the defendant had let this friend into the apartment to use the bathroom.

apartment to the defendant's girl friend.  Immediately upon returning home, Bautista heard the adjacent door of the left-side apartment open and close.  He looked out the front window and saw the defendant in the front yard, signaling to Manny to drive the SUV over the grass on the side of the house and around to the back yard.[10]

Bautista immediately went to the back of his house to see what was happening.  He witnessed Manny step out of the vehicle and show the defendant something in the back seat.  Bautista could not see what it was, or whether there was anyone else in the SUV (the windows were tinted), but both men appeared "excited."  Bautista saw only the defendant and Manny, and did not know whether there was anyone else inside the left-side apartment at the time.  At this point Manny noticed Bautista watching, and informed the defendant.  Bautista asked the defendant what was happening.  The defendant, who was acting "normal," said that his friend had come to pick up old furniture.  Bautista asked the men to use the driveway next

---

[10] Although Bautista did not specifically identify Manny as the driver, the jury could reasonably infer that Manny was driving the SUV at this time.  The defendant later told police that when Manny and his friend arrived, the defendant let the friend go inside the apartment to use the bathroom.  From this, the jury could infer that when Bautista heard the door of the left-side apartment open and close, he heard the victim entering the defendant's girl friend's apartment.  This would leave Manny as the driver of the SUV.

time, and then left the duplex, leaving the defendant and Manny behind the home with the SUV.[11]

After spending approximately thirty minutes alone at the apartment, at around 11:40 A.M., Manny and the defendant began driving back toward Hartford. It is not clear whether the victim was alive at this time. Manny traveled in the victim's SUV, presumably with the victim or the victim's body, while the defendant followed them in his mother's Pontiac Grand Prix automobile. Cellular telephone records show that the defendant and Manny exchanged two calls at 12:06 and 12:10 P.M., and at this time both men were located in the Bloomfield, Connecticut, area.[12]

At some point during the period beginning when the victim arrived in Springfield, and through the time that Manny and the defendant were in Bloomfield, the victim was strangled to death with a ligature. Manny and the defendant left the victim's body in the back seat of the SUV, parked in the parking lot of a Bloomfield retail store. Manny then got into the Grand Prix, and the defendant drove him back to work in Hartford, where he arrived approximately between 12:30 and 12:45 P.M. Once back,

---

[11] Bautista testified that his exchange with the defendant in the backyard lasted from four to five minutes.

[12] A Massachusetts State trooper testified that the drive from downtown Springfield to the police department in Bloomfield, Connecticut, takes "[p]robably [thirty] minutes."

Manny showed his boss about $4,000 to $5,000 in cash, and said that he had just sold a "kilo," but that the sale had taken longer than expected because he had to show the buyer "how to cook up the cocaine."

The victim's body was discovered the following evening by members of the Bloomfield police department, lying face down across the back seat of the SUV, which was parked in the store's parking lot.  Connecticut State police investigators processed the SUV for evidence; they took swabs to be used for deoxyribonucleic acid (DNA) testing, and collected dirt samples, fibers, and latent prints from the interior and exterior of the vehicle.  DNA matching the defendant's profile was discovered on the slide control lever of the rear driver's side seat, used to move the seat forward and backward.  Investigators also found a torn piece of white latex glove on the floor that revealed a mixed sample of DNA matching the profiles of Manny and the victim.  In addition, investigators located dirt and debris on the floor near the rear passenger's side door.

The defendant gave multiple statements to police.  In his first statement on February 2, 2010, the defendant denied knowing Manny or the victim, and said that he had not left Hartford because he was on probation and could not leave Connecticut.  Later that evening he gave a second statement, in which he admitted that he had in fact been in Springfield.  The

defendant also acknowledged that he knew Manny from a Hartford barbershop.  He told the police that Manny had visited him in Springfield, and had brought a friend -- an unidentified African-American male -- driving the SUV.  The defendant said that he let this friend inside the apartment to use the bathroom.  Then, according to the defendant, Manny and his friend got into the SUV and drove to a retail store in West Springfield.  The defendant said that he followed them in the Grand Prix.  According to the defendant, the three stayed at the retail store for twenty minutes, and then drove on the highway toward Hartford, stopping at two restaurants along the way.  The defendant said that while they were leaving the second restaurant, Manny called him and asked for a ride, because Manny's friend was going elsewhere and Manny needed to return to work.  The defendant then picked up Manny and drove him back to work in Hartford.[13]

Sufficiency of the evidence.  At the close of the Commonwealth's case, the defendant moved for a required finding of not guilty, arguing (in part) that there was insufficient

---

[13] The defendant gave a third statement to members of the Massachusetts State police on July 27, 2011.  Earlier that month, a State trooper was assigned to help Connecticut State police in the investigation of the victim's death.  In this statement, the defendant repeated his explanation that Manny had brought a friend to visit him in Springfield, and that he had let Manny's friend inside the apartment to use the bathroom.

evidence for a jury to conclude that the murder had occurred in Massachusetts.[14]  Although the defendant's motion was denied, the judge subsequently instructed the jurors that in order to find the defendant guilty and punishable in Massachusetts, they must find beyond a reasonable doubt that the defendant's "Massachusetts conduct . . . led to the victim's death."[15]

"It is elementary that it must be shown that jurisdiction lodged in the courts of Massachusetts before the defendant can be found guilty of the offence charged."  Commonwealth v. Fleming, 360 Mass. 404, 406 (1971).  See Vasquez, petitioner, 428 Mass. 842, 848 (1999) ("The general rule, accepted as

---

[14] The defendant also challenged the sufficiency of the evidence that there was a joint venture between the defendant and Manny, and that the defendant had committed assault and battery or armed robbery.

[15] The judge read to the jury the language of G. L. c. 277, § 62, which confers on the Commonwealth jurisdiction to hear certain cases of homicide where it is uncertain whether the homicide occurred within Massachusetts.  It states in relevant part:  "If a mortal wound is given, or if other violence or injury is inflicted . . . in any county of the commonwealth, by means whereof death ensues without the commonwealth, the homicide may be prosecuted and punished in the county where the act was committed."  We have interpreted the statute to require that the Commonwealth establish that "the death [was] one that would not have occurred but for the violence or injury that was inflicted in Massachusetts."  Commonwealth v. Lent, 420 Mass. 764, 768-769 (1995), citing Commonwealth v. Travis, 408 Mass. 1, 8-10 (1990).  The judge further instructed the jury that with respect to the additional charges of armed robbery and assault by means of a dangerous weapon, "the Commonwealth must prove that the entire crime occurred within Massachusetts . . . beyond a reasonable doubt."

'axiomatic' by the courts in this country, is that a State may not prosecute an individual for a crime committed outside its boundaries"). It is our practice that where there is a genuine factual dispute as to whether a crime was committed within Massachusetts, as here, that issue is to be submitted to the jury in the form of an instruction. "'Whether a criminal act occurred within the territorial boundaries of the Commonwealth, and thus whether the Commonwealth has jurisdiction over the individual charged with that act, is a question of fact to be settled by proof.' . . . As such, it is an issue entrusted to the deliberative process of the jury." Commonwealth v. Travis, 408 Mass. 1, 8, quoting Gilbert, 366 Mass. at 28. See 1 W.R. LaFave, Substantive Criminal Law § 4.1(b), at 354-355 (3d ed. 2018) ("At least when the matter has been put into issue by the defendant, whether the prosecuting government actually has criminal jurisdiction over the conduct of the defendant is, under the prevailing view, a matter to be determined by the trier of fact" [footnote omitted]). Contrast Commonwealth v. Jaynes, 55 Mass. App. Ct. 301, 308-310 (2002) (no jurisdictional instruction required where evidence made it "not reasonable nor possible to assume that the victim was not forcibly confined or murdered in Massachusetts"); Commonwealth v. Adelson, 40 Mass. App. Ct. 585, 589-590 (1996). Where territorial jurisdiction is a triable issue, the Commonwealth's burden of proof is the same

as it is for the substantive elements of the crime(s) charged, that being proof beyond a reasonable doubt. See, e.g., DiMarzo, 364 Mass. at 672-673. And on appeal, we consider whether there was sufficient evidence for a finding beyond a reasonable doubt of territorial jurisdiction. Id.

In these circumstances, we treat territorial jurisdiction as if it is an element of the offense. Our review of the legal sufficiency of the evidence is made with specific reference to the substantive elements of the offense. See Jackson v. Virginia, 443 U.S. 307, 324 n.16 (1979); Commonwealth v. Latimore, 378 Mass. 671, 677-678 (1979). Our standard in Latimore is derived from the United States Supreme Court's decision in Jackson. See Latimore, supra. This is typically expressed as deference to the jury or fact finder's judgment regarding the sufficiency of the evidence when, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (emphasis in original). Id. at 677, quoting Jackson, supra at 319.

Proof of an essential element of a crime may be based on reasonable inferences drawn from the evidence, but it may not be based on conjecture. See, e.g., Commonwealth v. Gonzalez, 475 Mass. 396, 407 (2016). "[I]t is not enough for the appellate court to find that there was some record evidence, however

slight, to support each essential element of the offense; it must find that there was enough evidence that could have satisfied a rational trier of fact of each such element beyond a reasonable doubt."  Latimore, 378 Mass. at 677-678.

The Commonwealth's case against the defendant consisted for the most part of inferences drawn from circumstantial evidence. Of course, "evidence of a defendant's guilt may be primarily or entirely circumstantial."  Commonwealth v. Lao, 443 Mass. 770, 779 (2005), citing Corson v. Commonwealth, 428 Mass. 193, 197 (1998).  Indeed, cases built entirely on circumstantial evidence are often strong.  See, e.g., Commonwealth v. Fitzpatrick, 463 Mass. 581, 590-594 (2012).  The inferences drawn from such circumstantial evidence "need only be reasonable and possible and need not be necessary or inescapable."  Commonwealth v. Fernandes, 478 Mass. 725, 739 (2018), quoting Commonwealth v. Linton, 456 Mass. 534, 544 (2010).  See Lao, supra, quoting Commonwealth v. Giang, 402 Mass. 604, 609 (1988) ("Whether an inference is warranted or is impermissibly remote must be determined, not by hard and fast rules of law, but by experience and common sense").  Still, a conviction may not "rest upon the piling of inference upon inference or conjecture and speculation."  Commonwealth v. Mandile, 403 Mass. 93, 94 (1988). See Commonwealth v. Kelley, 359 Mass. 77, 88 (1971) ("no

essential element of the crime may rest in surmise, conjecture, or guesswork").

The Commonwealth's theory of the case was that the victim was strangled inside the defendant's girl friend's apartment in Springfield. All of the victim's injuries in this case were, according to the testimony of the substitute medical examiner, consistent with the ligature strangulation that caused the victim's death. The examiner testified that it typically takes from four to five minutes to die in this manner.[16] The jurisdictional question, therefore, is whether the Commonwealth submitted to the jury sufficient evidence of the defendant's strangulation in Springfield. Stated more formally, we must consider whether, viewing the evidence in the light most favorable to the Commonwealth, any rational trier of fact could have found beyond a reasonable doubt that the victim was strangled in the Springfield apartment. Latimore, 378 Mass. at 677.[17]

---

[16] Although the trial transcript reads "forty minutes, forty-five minutes," this appears to be a typographical error; the prosecutor argued in closing that it took "four minutes" for the victim to die.

[17] In opposing the defendant's motion for a required finding of not guilty, the Commonwealth argued that "based on telephone records, map and the main contact at the time the victim was picked up in Connecticut, brought down to Massachusetts, the [d]efendant's statements that said, [d]efendant's statements say brought a gun with him, and his wife brought him in the house, there were no phone calls during that period of time . . . .

Viewing the evidence in the light most favorable to the Commonwealth, a rational juror could infer the following:  the defendant was part of a plan that involved Manny, the victim, and a drug deal; the victim was alive when he arrived with Manny at the defendant's girl friend's Springfield apartment; the victim was alone at the apartment with Manny and the defendant for approximately thirty minutes; and while traveling from Springfield to Hartford, the defendant and Manny stopped briefly in Bloomfield, where they left the victim's body inside the SUV. In addition, the jury heard evidence that the defendant had initially lied to investigators about being in Springfield on the day of the killing.  These facts do not resolve the essential question of where the victim was killed.  Beyond the above facts, the Commonwealth cites two additional points -- the positioning of the victim's body in the SUV, and the absence of dirt on the victim's shoes -- to support the inference that the victim was killed in Springfield.

---

[T]here was contact between them going up to Massachusetts, that this [d]efendant's DNA, the form of [Manny's] DNA, the victim's shoes, shows there is a lot of evidence that would show that he went into the house and was carried out and put, stuffed in an SUV, that the death occurred in Massachusetts" (emphasis added). The Commonwealth has not provided us a transcript reference showing that the jury heard that the defendant had a gun or that Manny had brought a gun with him, and we have not found any such evidence in the record.

Regarding the first point -- the positioning of the victim's body -- the Commonwealth focuses on the testimony of the substitute medical examiner, who testified that in light of the size of the petechial hemorrhaging in the victim's eyes, he "might have been in the face down position" when strangled. The medical examiner testified further that the lividity pattern on the back of the victim's neck suggested that he was placed on his back after he died.[18] In addition, the victim was found lying on his stomach in the SUV. The Commonwealth contends that these facts support an inference that the victim was not killed in the SUV but, rather, was placed there only after being killed in Springfield. Critically, the Commonwealth did not elicit testimony from the substitute medical examiner as to how long it takes for a lividity pattern to form. It remains uncertain, then, for how long the victim may have been on his back before being placed on his stomach. Although these facts support an inference that the victim's body was moved in some manner at some point after he died, they do not establish where that occurred, let alone establish beyond a reasonable doubt that the

---

[18] The substitute medical examiner testified that bruising on the victim's neck "could be part of the lividity pattern." As for how a lividity pattern forms, she explained: "After death where the heart stops circulating, the red blood cells will be pulled right down to its lowest position, so if you were lying on your back, the red blood cells would go to the back of your body and cause a pinkish reddish discoloration."

victim was killed in Springfield.  On this evidence, no rational trier of fact could have found beyond a reasonable doubt that the victim was strangled inside the Springfield apartment.[19]

The second fact that the Commonwealth cites to support territorial jurisdiction -- the absence of dirt on the victim's shoes -- establishes even less.  The victim's shoes had no dirt on them when the police discovered his body, but police found dirt on the floor of the backseat of the SUV.  In addition, Bautista stated that the weather "wasn't that cold or anything for January," that "the temperature was very nice," and that there was no snow on the ground.  During cross-examination of Bautista, defense counsel introduced a photograph of the back yard of the Springfield apartment, which showed a mix of green and brown patches.  The Commonwealth suggests that a jury could infer from these facts that (1) the back yard of the Springfield

---

[19] Although the substitute medical examiner testified that it would have taken from four to five minutes for the victim to die, she did not offer an estimation as to when the victim died or for how long the victim had been dead.  Contrast Commonwealth v. DiMarzo, 364 Mass. 669, 672 (1974) ("A medical examiner testified at length and placed the time of death as being within seventy-two hours of the time of the autopsy . . .").  The SUV's windows were tinted, and it is not clear precisely how long Manny and the defendant were in Bloomfield.  Cell phone records show that Manny and the defendant were in Bloomfield by 12:06 P.M.; Manny's supervisor testified that Manny returned to work "around 12:30 to 12:45" P.M.  The victim's wife estimated that the drive from her home in Hartford to the Bloomfield retail store where the victim's body was found takes "[a]bout 10, 15 minutes."

apartment was muddy on the day of the killing, and (2) further -- because there was mud on the floor of the SUV, but not on the victim's shoes -- that the victim was carried out of the Springfield apartment by Manny and the defendant, whose muddy shoes left dirt on the floor of the SUV.[20]

No rational juror could infer as much from these facts. No evidence was introduced regarding the actual temperature in Springfield on the day of the killing, or in the days leading up to it. In addition, two New Englanders might well disagree about what it means to be "not that cold" or "very nice" on a given day in January; even then, such testimony does not itself establish the condition of the ground that day. Asked whether the photograph introduced by the defense accurately depicted his back yard as it looked on January 22, 2010, Bautista responded that the photograph was "from autumn and back then it was winter." Moreover, the brown patches in the photograph appear to be grass, not dirt. And although a dirt sample was taken from the SUV, it is not clear whether it was ever sent for analysis; no dirt sample was ever taken from the back yard of the Springfield apartment, however, so as to compare it with the dirt found in the SUV. In short, the condition of the back yard, and the source of the dirt in the SUV, remain wholly

---

[20] The Commonwealth's witnesses characterized the material found on the floor of the SUV solely as "dirt," not "mud."

speculative.  This evidence similarly cannot serve as the foundation for a finding beyond a reasonable doubt that the victim was killed in Springfield.

The few cases in which this court has previously considered the sufficiency of the evidence for purposes of territorial jurisdiction contained stronger facts supportive of a finding beyond a reasonable doubt that the killing (or "other violence or injury") occurred within the boundaries of the Commonwealth. In Commonwealth v. Lent, 420 Mass. 764, 765, 767 (1995), for instance, the body of a murdered twelve year old boy from Pittsfield was found tied to a tree near Ithaca, New York. Although the court acknowledged that the fatal strangling "occurred entirely in New York," it nonetheless upheld jurisdiction over the case in light of "evidence of [the defendant's] infliction of violence and injury on the victim in Massachusetts."  Id. at 769-770.  In that case, the defendant told police that that he had used a knife on his victim and attempted to rape him in the defendant's Massachusetts apartment before taking him to New York.  Id. at 766-767, 770.

Similarly, in Travis, 408 Mass. at 8-9, the victim, whose body was eventually found in Rhode Island, was kidnapped in Massachusetts during a robbery of the video store where she worked; there was evidence that her hands were bound during the kidnapping, and a witness testified that while kidnapping her,

the defendant had committed a battery.  In addition, "there was evidence from which the jury could conclude that [the victim] did not die in the wooded lot where she was discovered."  Id. at 9, citing DiMarzo, 364 Mass. at 672.  The court thus concluded that "the evidence presented to the jury allowed them reasonably to conclude that the defendant had inflicted 'violence or injury' on [the victim] while she was within Massachusetts, and that this 'violence or injury' had led to [her] death."  Travis, supra.  See DiMarzo, supra (evidence sufficient to send territorial jurisdiction to jury where "there was ample evidence that the beatings which eventually led to the death of the victim took place in Massachusetts"; witness saw defendant place large duffel bag in motor vehicle on day of killing, at house in Massachusetts where victim resided with defendant; and "there was evidence that the victim did not die at the tree where her body was discovered").

No such evidence exists in this case to establish Massachusetts as the location of the killing.  Investigators did not, for instance, search or obtain forensic evidence from the Springfield apartment.  Nor is there any witness besides Bautista who testified as to what transpired in Springfield.[21]

---

[21] As noted, Manny was also charged with murder in the first degree for killing the victim, and this court affirmed Manny's conviction.  See Williams, 475 Mass. at 723.  Jurisdiction was not an issue in that case, however, as the Commonwealth had

In the absence of additional facts, the jury were left to guess whether the victim was killed in Springfield, as opposed to in Connecticut.  See, e.g., Gonzalez, 475 Mass. at 412, quoting Mandile, 403 Mass. at 94 ("No[] conviction [may] rest upon the piling of inference upon inference or conjecture and speculation").

In light of this conclusion, we need not consider the other issues raised by the defendant.  The defendant's convictions are reversed.[22]

So ordered.

---

introduced Manny's statements to the police describing, in incriminating fashion, his version of events at the Springfield apartment on January 22, 2010.  Id. at 708.  The Commonwealth did not seek to introduce Manny's statements at the defendant's trial.  See generally Bruton v. United States, 391 U.S. 123 (1968).

[22] Our conclusion that we lack territorial jurisdiction with respect to the charge of murder in the first degree applies equally to the lesser included offense of assault and battery by means of a dangerous weapon.